## DUGGAN v. McBREEN et al.

**Will**: MENTAL CAPACITY OF TESTATOR: QUESTION FOR JURY. The will in question was drawn by the testator's physician, and executed about ten o'clock at night, and he died at two o'clock in the afternoon of the next day. The physician testified that he believed him to be of sound mind when the writing was executed, and the parish priest, who half an hour afterwards administered the sacraments to him, was positive that he was conscious during a part of the time while they were being administered. But some of the expert testimony tended to show that his mental powers must, from the nature of the diseases from which he suffered, have been impaired when the writing was executed. He made a bequest to a sister whom he named Bridget, but he had no sister of that name, but had one named Anna, who was forgotten. He devised most of his property to plaintiff, who was a son of the people with whom he had lived, and to whom he owed no special obligation, and gave only small sums to relations, with whom he was on terms of friendship, and this he did after asking plaintiff's mother to accept his property, and her refusal to do so. All this was done in a short time after the physician made his professional call, and advised the testator that he was very sick, and ought to arrange his business affairs as soon as he could. *Held* that there was some evidence of mental incapacity, and that the court erred in directing a verdict for plaintiff,—the proponent of the will.

*Appeal from Dubuque District Court.*—HON. C. F. COUCH, Judge.

FILED, OCTOBER 22, 1889.

THIS is a proceeding by Michael Duggan for the probate of an instrument in writing alleged to be the will of James McBreen, deceased. After the parties to the proceeding had rested their case, the court instructed the jury to return a verdict for the proponent. A verdict was returned in accordance with the instructions, and the instrument was admitted to probate as the will of decedent. The contestants appeal.

*McCeney & O'Donnell*, for appellants.

*Jas. C. Longueville* and *J. H. Shields*, for appellee.

ROBINSON, J.—James McBreen, a widower, died at the age of sixty-seven years, possessed of an estate of the value of between seven thousand dollars and eight thousand dollars. The day before his death he executed the instrument in controversy. That portion of it which we need to consider is as follows: " * * * I give and bequeath as follows: (1) To Mrs. Ellen Peters, of Pennsylvania, the sum of three hundred dollars. (2) To Bridget Devlin, the sum of two hundred dollars; residence, Steubenville, Ohio. (3) To the heirs of Andrew McBreen, fifty dollars each. (4) To my brother Peter McBreen, two hundred and fifty dollars. (5) To my sister Bridget Carroll's children, fifty dollars each. (6) To Sarah McCaffrey, my adopted daughter, the sum of fifty dollars. (7) To Mrs. L. Duggan, my friend, the sum of two hundred dollars. The residue of my property, after all the above sums are paid, I give and bequeath to my friend Michael Duggan, to have and to hold forever. And I hereby appoint Michael Duggan as my sole executor of this, my last will and testament, without bonds, or any recourse to the courts whatever, or security to any one." Decedent had made his home with L. Duggan for about four years prior to his death. Mrs. L. Duggan was the wife, and Michael Duggan was the son, of L. Duggan. Andrew McBreen was a brother, and Mrs. Peters and Mrs. Devlin were sisters, of decedent. He had also had a sister named Anna Carroll, but none named Bridget. The amount of the bequests named in the instrument in question, exclusive of that specified for proponent, seems to have been about fifteen hundred dollars. There were two trials in the court below. On the first trial the jury returned a verdict in favor of contestants; but that verdict was set aside on the application of proponent, and a new trial granted.

I.　It is contended by appellants that some of the evidence showed that decedent was not of sound mind, and did not possess testamentary capacity, when the instrument in question was executed, and that it was their right to have the jury decide that question.　It appears that, at the time the instrument was executed, decedent was suffering from a complication of diseases, among which was a kind of *diabetes*, which was the chief cause of his death, but it was aggravated by a fistula and gravel.　These diseases tended to exhaust his system, and the *diabetes*, in its last stages, to produce *coma*.　On the day preceding his death, his physician, Dr. Lambert, was called to treat him.　It was eight or nine o'clock in the evening when the doctor reached the house, and some time after that before he visited the room of McBreen.　After making an examination, the doctor informed his patient that he was a very sick man, and advised him to arrange his business affairs as soon as he could.　McBreen said he had not attended to them, but would.　The doctor thinks he told him he could not live longer than until sunrise of the next morning.　It does not appear that McBreen had known the fatal nature of his illness until that time. It was a stormy, bad night, and, no other person being available, Dr. Lambert drew the instrument in suit, and it was executed and witnessed as the will of McBreen. The time when that was done is not definitely fixed, but it may have been as late as ten o'clock.　At half past ten o'clock, Father Toohis, the parish priest, was called into the room, and found McBreen breathing heavily, and in a stupor, from which it required an effort to arouse him.　The sacraments of penance, communion and extreme unction were administered.　The priest is positive that he was conscious while two were being administered, and the physician is of the opinion that he was of sound mind when the writing was executed, and it may be that a preponderance of the evidence was to that effect.　We are of the opinion, however, that there was some evidence to the contrary.　McBreen died at two o'clock in the afternoon of the next day.

When the physician arrived, he was suffering much pain. His brother arrived at midnight, but he spoke no more in his presence, and it is not shown that he was conscious after the second sacrament was administered. Some of the expert testimony tended to show that the mental powers of McBreen must have been weakened and greatly impaired when the writing was executed. He failed to give the name of one sister correctly. He had entertained only friendly feelings for his relatives, and often visited them. Within about a year before he died, he had expressed an intention to leave all his property to them, and no reason for any change of purpose is shown. He had made his home with the Duggans for several years, but had paid for his board, and for services rendered him. When he was informed of his approaching death, and advised to arrange his affairs in preparation for it, he does not appear to have had any definite plan for the distribution of his property. While the writing was being prepared, he asked Mrs. Duggan if she would not accept his property, but she refused, and the provision in regard to her son was then drawn. It does not appear that there was any particular reason for that provision. It is not shown that McBreen had any special regard for the son, nor that their relations had been intimate. None of these facts, considered alone, would establish testamentary incapacity, and all of them, taken together, may not; but we think their weight should have been submitted to the jury for determination.

II. It is claimed that the writing in question was the result of undue influence. In view of the conclusion already stated, we need not review the evidence on that point. It is only necessary to say that the record submitted to us does not show evidence which would justify a verdict for contestants on that ground. Other questions discussed by counsel are not likely to arise on another trial, and will not be determined.

REVERSED.