In re Estate of Edna Myrtle Grange.

Vera G. James, Appellee, v. Jessie Thomas et al., Executrices, Appellants.

No. 45742.

March 10, 1942.

T. E. Klay and Verne W. Vance, for appellants.

Cornwall & Cornwall and Heald & Heald, for appellee.

Hale, J.—On June 13, 1940, the will of Edna Myrtle Grange, dated August 5, 1939, was filed in the office of the clerk of the district court of Clay county. The will was contested by Vera G. James, the sister of decedent and the only living member of her family, on the ground that testatrix was mentally incompetent. There was trial to a jury and verdict for the contestant. Proponents filed motion for new trial, exceptions to instructions,

and motion for judgment notwithstanding the verdict, all of which were overruled.

Edna Myrtle Grange was born near Ireton, Iowa, in the year 1890. She was a premature child and was not healthy throughout her life. She was difficult, irritable, nervous, and jealous. The record shows that there were three children in the family, one of whom, William, died when a youth. Edna was the oldest. Her parents were kind and devoted, realized that she was unusual, and apparently gave her special care, including three trips and winters in California. After moving to a farm near Sioux Rapids in 1898, Edna attended school, was graduated from high school, and attended for a time the teachers college at Cedar Falls. After this she taught school, but in 1922 she suffered a breakdown and was taken to her home and did not teach any more. She was attended by various doctors, and in June 1940, her condition became so serious that she was taken to St. Bernard's Hospital at Council Bluffs, and there committed suicide on June 10, 1940.

Her will was offered for probate and a contest instituted. A motion for directed verdict on the ground of insufficiency of the evidence was made by proponents, and was overruled, as were also motions for new trial and for judgment notwithstanding verdict. The question in this case is whether or not the evidence produced by contestant presented a jury question. It is therefore necessary that we review to some extent the contestant's evidence. There was a large number of witnesses whose testimony was offered by the contestant, and a larger list who testified for the proponents. As is usual, their testimony disagrees, and in the opinions expressed there was a decided difference.

██ Three medical witnesses testified for the contestant. Dr. Ash, medical director at St. Bernard's Hospital, and a witness of large experience in mental and nervous diseases, could testify only as to his observation and the medical history of the patient, and, from observation, only as to the period from June 3, 1940, until the day of her death. He testified that she suffered from manic-depressive psychosis, characterized by agitation, talkativeness, excitement, flighty ideas, marked delusions principally persecutory in nature, and lack of insight into her condition. He testified generally as to the type of mental illness with which she

was afflicted and gave his final conclusion that she was of unsound mind at the time she was at St. Bernard's Hospital and that she had suffered from manic-depressive psychosis since 1923.

Dr. Dean H. King, of Spencer, who, besides his general practice, had had some experience—about three months— in a hospital for mental diseases in Rhode Island, first treated Edna Grange in March 1936, for ailments of a physical nature. She was afflicted with nervous troubles and menstrual difficulties, besides other complaints. The doctor prescribed a nerve sedative and a diet. There were frequent treatments for her nervous condition and frequent complaints by her as to such condition. The treatments continued through the summer and afterward, and in February of 1937, and throughout that year, and afterward in 1938. In the late fall of 1938 she asked for a statement as to her sanity, being at the time very nervous and excitable. The doctor complied with her request and gave her a statement that, in his opinion, she could conduct her own business affairs. His next occasion for observation and treatment was in 1939. The last time was in 1940, shortly before she was removed to the Council Bluffs hospital, when he found the patient in a very excited and nervous condition, with disjointed and unconnected ideas. He testified that from her first visit she appeared neurotic, and during the course of his acquaintance and treatment she talked louder and louder, and became manic, and developed a raving state when she would become extremely excited, sobbing and crying. The condition was progressive. The rest of the time she would be the opposite of this depressed condition, and would be more calm and cheerful; but on each successive time she seemed to be more psychoneurotic until the last two times he saw her. A good many of her complaints were due to her mental condition; a good many were imaginary. This doctor also stated that the disease was manic-depressive psychosis, a form of insanity. The progress of the disease in this case was quite rapid, and in reality there were no lucid intervals; she had arrived at the chronic stage of the disease previous to the time he first saw her, and it became more acute. In his opinion, the doctor stated, she was insane in 1937, and up to November 2, 1938, she would not be competent to know the extent of her property, appreciate the demands of those who might be entitled to her bounty, and to

know the disposition that she would want to make of her property. His office memoranda as to her condition were introduced in evidence, but there was no mention made therein as to her mental condition, except for one item made a considerable time after her last visit, in which he stated that he had advised a brother-in-law as to the patient's mental condition. Dr. King testified as to her excitable condition during his observation, and explained, as to the statement he gave her, that she did not tell him why she wanted a certificate.

Dr. Swallum, of Spencer—formerly of Sioux Rapids—was a witness. He qualified as to his experience and stated that he had known Edna Grange since 1933. He testified as to her extreme nervous state and her imagining that she had done her mother a great wrong before her mother died, and that she worried about the wrong she had committed, and imagined that she had caused her mother's death, or helped cause it. She spoke of the "unpardonable sin." The fact is, as shown by various witnesses, that her relations with her mother were extremely affectionate, although at times she had complained of her father as not giving her the same chances as her sister. Dr. Swallum testified that she was extremely excited at all times, and, by the time she would get through explaining her symptoms, she would be almost screaming; she was extremely hysterical. He also gave her sedatives and prescribed a diet, recommended a treatment to induce sleep, and advised that she change her environment. During the first treatment the doctor diagnosed her trouble as neurasthenia, an extremely excitable mental state and also an imaginative state; her only trouble was mental. Later, after a couple of years, when she was again brought to him for treatment, he found she was extremely excited, had not slept for days, imagined all sorts of things, was afraid someone was trying to steal things from her—such as stock and personal belongings, and articles belonging to her father. She complained of her treatment by her family, that her father had prevented her from having company, and that her sister did not treat her right. Her mother had died at that time but her father was always considered as thoughtful and very much concerned about her well-being. These visits to Dr. Swallum's office continued for several years. She informed him on different occasions that she was going to commit suicide.

This was during the years 1926, 1927, and 1928, and at that time she was very hysterical. After 1923 her mental symptoms were more severe. In 1925 the doctor suggested a companion for Edna, and the family then went to Sioux City and got a little girl—Maxine—from the childrens home. After this Edna would become excited over something that might happen to this child. These conditions continued until the death of her father, in 1933. In June 1939, she visited the doctor again at his office in Spencer, and consulted with him about Maxine's desire to become a nurse. These visits continued throughout the summer and until October, and from June to October the doctor saw her two or three times a week. She was undecided about the nursing school the girl should attend and had difficulty making up her mind. She seemed, on these visits, to be suspicious of Maxine and said that she could not be trusted. At these times she was agitated, excited, and nervous. Her mental condition at that time was just the same as previously. He testified that he would not say she was of sound mind at any time. He also said she was suffering from manic-depressive psychosis and that she had been during all the years he had testified about; that it had reached the chronic stage, and that in that stage the patient can be more or less violent, he has hallucinations and delusions and feels that someone is trying to do him harm. Edna was not of sound mind during the summer of 1939. He stated that he signed a certificate as to her mentality, that he did not want to disagree or argue with the patient and she asked for a statement showing that she could carry on her own affairs. She was at the time very hysterical, and he gave the statement for therapeutic reasons; it would be the worst thing he could do to tell a person suffering from a mental disorder that he had a mental disorder. The doctor did not believe Edna had any lucid intervals during the summer of 1939, and said that at no time during that summer could she have been competent to know and understand the extent of her property and the persons entitled to her bounty. This witness, on cross-examination, testified that he had informed the patient's father that she was insane, and that the family objected to any institutional treatment. In referring to financial matters, Edna was suspicious, and dissatisfied with her brother-in-law, and there was evidence that, in the work which he did

for her as a lawyer and as manager of the farm belonging to the sisters, Edna and Vera, he was not overpaid, nor did he take advantage of her. The witness stated that she could make ordinary purchases from stores, for her needs, and that she could carry on her business affairs of that nature without being cheated. She was dissatisfied and suspicious.

The testimony of various neighbors and friends was given, but it is not possible within the limits of this opinion to give more than a summary of some of the main points of their testimony. Hannah G. Larson testified to many matters in connection with her frequent visits—such as her having been compelled to work too hard, wear poor shoes that her parents had given her, who, as a matter of fact, were quite indulgent. She was jealous and envious of her sister Vera; always melancholy or depressed; she cried a great deal, moaned, and screamed. She was a careless driver of a car, and threatened suicide. She complained that her father and mother had not done justice to her. The last time Edna came to see the witness it was for the purpose of paying a bill; she opened her pocketbook, but did not get the money out, and did not pay her. This witness was a beneficiary under the will.

Olga Ness, also a legatee under the will, testified as to an extended acquaintance with the testatrix. She testified that decedent was very unusual, depressed and unhappy, imagined she had cancer, and was always complaining of some physical disability. She was inclined to scold Maxine; she was afraid she was being cheated; she was inclined to cry, and was hysterical. She worried greatly about the purchase of certain articles, and the witness never knew her to be satisfied when she had made up her mind. Her conversation was "always mixed up, hard to get any connection and when she got real excited it was something that was mixed up." The conversation was sometimes about Maxine, and sometimes about her parents, and she had a bitter feeling toward her father for some reason. She blamed her father for the home, which she did not like, and she wished that her folks had let her die. She said her folks had favored her deceased brother; told that she had a rope in the attic and "one of these days they might find her hanging." This was in October 1939. She never was cheerful and happy. There were times

when she would not complain so much, but the witness did not know when she was ever so that she did not complain about something, usually repetition, about the same thing. There was much testimony to the same effect, but the substance of this witness's testimony is as given. The witness testified that, in her opinion, Edna was not of normal and sound mind, and she did not believe that she was normal.

To much the same effect the witness Gladys Cuthbert testified. She had an acquaintance extending back 32 years, and knew the family quite intimately. Edna was 18 when she first made her acquaintance. Delos Grange was an indulgent father and the mother was very thoughtful of her children; but, ''Edna was the most peculiar person I ever knew. Was never happy and never quite content with her lot in life. That was through all the time I knew her.'' These peculiarities increased as the years went by, and she grew more despondent and more jealous. After her nervous breakdown, in 1923, she said many times she ''had a notion to end it all.'' She always criticized her father for what he did for her, said that he was always better to Vera than to her. The witness said that she never noticed that the father preferred one to the other. After his death Edna cursed the name of her father. She repulsed efforts of Vera to be kind to her, and was very jealous of her. This witness testified as to the deceased's imagining ill health, that she thought she had a cancer, and that people were ''talking behind her back.'' She stated that she hated her sister's children.

The child, Maxine, who was taken from the home and afterward lived with the Grange family, was a witness, and testified fully as to her life with Edna, which testimony was to much the same effect as that of other lay witnesses—that the deceased had crying spells; would go upstairs and eat alone; would stamp her feet and wring her hands; the crying spells would last all day and at night, and her father and sister would try to comfort her. She talked a great deal about her brother, William, who had died in 1910, that she had not been with him when he died and her folks had schemed so she could not get there, and that she should have been there when he died in a Sioux City hospital. This talk was continuous throughout the years. She said that William had been treated better than she was, and that she had not had the

privileges that Vera had, but the witness said that there was no actual difference in the treatment of the girls, that the father was kind to both and to the witness herself. Edna's work around the house was ineffective, she was in the habit of starting at one thing and going on to another; and she complained about working so hard, although the others all worked and did not let her do anything by herself. She imagined people were talking about her. She said that her father had teased her boy friends when they came, and she blamed him because she did not have any boy friends and blamed her mother because she had talked against marriage. She complained of the food, which was good. She was not affectionate toward the witness and the witness never tried to be affectionate with her. During her crying spells she would throw herself on the floor and wish that she could kill herself. In 1939, going to church, she acted wildly. The witness complained that at the time she was afraid to ride with her and knew she was "awfully mad." "On the highway she started driving fast and said she wanted to kill us both." She never remembered if she had locked any doors. She was embittered against her sister and brother-in-law. After Maxine went to school Edna wrote very depressing letters to her, and objected to things that Maxine did. The witness described a violent scene in August 1939, when Edna flew into what the witness described as a "tantrum" and was very abusive. During the last year the decedent would get up during the night and go all over the house, into the attic, and outside, but would not stay long. Sometimes she never would come back to bed. The witness would waken and Edna would be downstairs. She had money all over the place, under the bed, under the mattress, under the pillow, down radiators, in drawers, and sewed in her clothes. She would forget where it was, and they would hunt all over the house for her pocketbook, which was usually found. She was bitter on the occasion of the death of her sister's baby, and said her sister and brother-in-law were being paid back for what they had done to her. Edna's spells became more marked as the years went by, and she did not talk as an ordinary, normal person. The witness stated that Edna taught a Sunday-school class in 1939, substituted, but was too nervous for the children. She described following her to prevent her getting poison, and taking it out of her hand. Her crying spells during 1939 often lasted a week.

Another witness, Bernice Knudson, also testified at length to much the same effect, and as to noticing Edna's forgetfulness and inability to remember. She stated that she knew Edna was of unsound mind. Seber Knudson also testified as to the family relations, the kindness of Delos Grange, and as to his own observation of an experience with Edna. He also testified as to her excitability; her crying, raving, talking loud, and screaming; complaints about her father and the treatment she had received, and how hard she had to work; and the reckless manner in which she drove. Her condition gradually got worse, and, in his opinion, Edna was of unsound mind all the time they lived on their place, a period of three years. F. J. O'Brien, president of the Clay County Bank, testified as to the decedent's nervous, irritable, and excitable condition, and his observation of her at the bank, of which she was a customer. He stated that Edna was not of sound mind. There was also testimony by Bessie West, a clerk in a store, who frequently waited on Edna, as to her indecision and vacillating manner in transacting business at the store, and the apparent hostility that she showed to her sister. This witness testified as to statements made by Edna in which she said that she had met her sister out in the street. The witness knew, however, that that was impossible, as Vera was at the time in the hospital with one of her children. At another time she complained of Vera's passing her on the street and not speaking to her, but the witness knew that that was not true, because she had just talked to Vera on the telephone. She stated that, from the facts she testified to, Edna was of unsound mind.

Vera James also testified, mostly as to the family history, and the kindness of the parents.

There were other witnesses. Evelyn Stillman, a teacher, repeated much of what has already been mentioned in the testimony of other witnesses, and testified as to Edna's general suspicion of all with whom she was intimately associated. The witness mentioned the marked change in her appearance in August 1938, that her complexion was pasty, and her lips swollen, and she seemed very much excited. Her letters reflected her nervous and irritable condition. Correspondence continued for some years between the witness and Edna. The witness was of the opinion that Edna had not what might be called a normal mind

after 1922, and that her mental condition grew gradually worse as the years progressed. In 1937 the witness noticed that she was unable to reason with Edna on anything "for a single minute."

A plumber, I. Remillard, who had done some work on the furnace in the house, related that, contrary to instructions, Edna would build fires in the range, although she had been informed that the coil would be spoiled, and this was repeated notwithstanding his instructions and protests; she did not remember or attend to such instructions. He also mentioned her crying spells that she seemed to have, and the imagined different treatment that she and her sister received from their parents. From his observation, she was of unsound mind during recent years. Remillard's son Miles testified to the occurrence at the time of fixing the cookstove, and in substance his testimony was about the same as his father's. He also gave as his opinion that Edna was of unsound mind.

There was other evidence along this line given by the witnesses. We have not attempted to set out the testimony in full, but have undertaken only to show the main points of testimony that the jury were entitled to consider. Witnesses testified to other matters, such as Edna's thinking that the sheriff would come after her, her complaint that her sister drove an automobile to school while she had to drive a horse and buggy, the change in her attitude from her former apparent affection toward her sister's children, and other matters of like character.

There was, of course, a large number of witnesses for proponents—some 26 in number. Some of these were neighbors; others had had less opportunity to observe Edna. Some belonged to organizations with, or were related to, people who had an interest in the will as legatees. There is no reason to question the convictions or honesty of these witnesses. It is not necessary to go into the testimony for the proponents, since our only inquiry is as to whether or not there was sufficient evidence of mental unsoundness to make this a jury question. Naturally, there is a conflict in the testimony of some of the witnesses for the proponents and those for the contestant in regard to some of the matters testified to. Some who had opportunity to observe Edna gave their opinions that she was mentally sound, but in several

instances there were not sufficient facts to justify an opinion as to sanity or insanity. However, whether or not the testimony of the proponents' witnesses was of great weight, yet it was for the jury to decide, in the event of a conflict, as to the weight and value of all the testimony. The only question that we have to determine is, Was the evidence, as we have here outlined, such as to authorize submission to the jury and for the jury to find that the decedent did not intelligently comprehend the estate she possessed, the natural objects of her bounty, and did not have the intelligence to exercise discretion and judgment in the disposition of her property? In our opinion it was sufficient. Many matters are argued by the proponents. We think it unnecessary to go into any extended analysis of the cases referred to by the parties. Nor do we disagree to any great extent with the abstract principles of law suggested. In proponents' brief and argument the exception to the court's action consisted in ascribing error to its refusal to direct a verdict on account of lack of competent evidence to support the burden of proof. The rule in a case of this kind is that the contestant would be entitled to have the evidence considered in the light most favorable to her. Nor can we pass on the facts in this case independently of the verdict of the jury. It is not the judgment of this court which shall determine the result, but that of the jury. It is likely that in this case, as in most cases of this kind, there might be a difference of opinion as to the conclusions that might be drawn from the evidence, but in such case, or where the evidence conflicts, the question is solely for the jury, provided, of course, there is enough testimony to warrant such finding. These principles are so well known and the rules pertaining thereto are so common that it is not necessary to review the various cases cited by proponents and contestant.

Many cases appear in our reports. Seldom, in any two cases, are the facts so exactly the same that the decision in one may determine the other. It would unduly extend this opinion and be of no great value, to undertake to summarize the evidence in the various cases or to distinguish the facts. In some of the cases cited the decision of this court was upon a trial de novo, equitable issues being presented. Such equitable cases, of course, cannot be considered as ruling in a case such as this where the action is at law.

█ Proponents cite various cases as sustaining their first argument, that the burden of proving lack of testamentary capacity is on the contestant and the question should not be submitted to the jury unless there is evidence which ought reasonably to satisfy the jury of the testatrix's mental incapacity; and they argue further that the scintilla rule has long since been abandoned in this state. Without referring further to the authorities cited, it may be conceded that this is the correct rule. Nor is there any question about their second contention, that some deterioration in physical or mental powers, or peevishness, childishness, or eccentricities, are not alone sufficient to carry to the jury the question of mental unsoundness on the part of the testatrix; citing In re Estate of Shields, 198 Iowa 686, 200 N. W. 219. Nor do we doubt that ability to transact some business is not essential to testamentary capacity.

█ Suicide does not raise a presumption of insanity at the time of the execution of the will but is a matter to be considered in connection with all the other testimony in the case. 68 C. J. 473, section 80. Proponents also argue, as one division of their second assignment of error, that the question to be determined is the mental condition of the testatrix at the very time of the making of the will. Neither can there be any question about this legal proposition. We think an examination of the testimony indicates, both in the expert testimony and that of the lay witnesses, that there was evidence showing that this condition existed at the very time of the execution of the will. It would be unreasonable to assume that the requirement of the law was that there should be eyewitnesses or that the witnesses who testified as to the mental condition of testatrix should have been present at the very time the will was signed. But this, like nearly all questions of fact, may also be shown, and we think is shown, by circumstantial evidence, as well as by the direct evidence that appears in the record as to testatrix's continuing mental condition.

Proponents also argue that the fact that a person is of unsound mind in the medical sense of the term is not proof of a lack of testamentary capacity. We think that there was evidence for the jury's consideration to warrant submitting to them the question of unsoundness of mind, whether of medical or legal definition.

Proponents' second assignment of error is to the same effect, and the reasons therefor are much the same as the first main assignment; and so also is the third, which is the alleged error of the court in overruling the motion for new trial. We need do little more than refer to the extracts from the record which we have given. Her competency, under the record, was a question that the jury must determine. We must hold the verdict is not one which we can disturb. The testimony of the witnesses showed Edna's peculiar condition of mind, action, and disposition, through her life. There was evidence which the jury might consider as to the type of mental disease with which she was afflicted. The jury had a right to consider that the disease was progressive and permanent and continued over the period during which her will was drawn and signed; that there was no lucid interval throughout that period; that she was not in a condition to recollect and know the extent of her property and the natural objects of her bounty, or to know and comprehend the manner in which she wanted to distribute her property, or the nature and claims of those who were excluded from participating. All these facts were testified to, and, whether contradicted or corroborated, or whether the evidence was credible or not credible, were questions for the jury to determine. See the case of Philpott v. Jones, 164 Iowa 730, 146 N. W. 859; and our recent case of In re Estate of Ensminger, 230 Iowa 80, 82, 296 N. W. 814, 815, and the cases cited therein.

We hold that there was competent evidence in this case from which the jury would be authorized to find that the legal requirements as to testamentary capacity did not exist. Our holding must be that the court was justified in refusing to direct a verdict and in overruling the motion for a new trial, and the cause must, therefore, be affirmed.—Affirmed.

BLISS, C. J., and SAGER, OLIVER, and GARFIELD, JJ., concur.