IN RE ESTATE OF THOMAS RING.

Nos. 46791
46867.

MAY 7, 1946.

OPINION MODIFIED AND REHEARING DENIED SEPTEMBER 23, 1946.

Campbell & Campbell, of Newton, for appellant.

Tomasek & Vogel, of Grinnell, for appellee.

954

MILLER, J.—On June 4, 1944, Thomas S. Ring died. He was a resident of Jasper County, Iowa. Two days later his will was filed for probate. The will was executed April 5, 1933. After providing for the payment of debts, it devised $500 to the Sacred Heart Catholic Church of Newton; $25 and $30 for masses for the repose of testator's soul; $12 for masses for the repose of the soul of his brother, William Ring; $100 for perpetual upkeep of testator's grave; $200 to The Fenwick and the Boys' Home of Cincinnati, Ohio, a Catholic institution; $200 to the Central Association of the Miraculous Medal, Germantown, Pennsylvania; $200 to the St. Francis Hospital, Grinnell, Iowa. The residue of the estate was devised sixty per cent to Father Flanagan's Boys' Home, Omaha, Nebraska, and forty per cent to the Catholic Extension Society, Chicago, Illinois. Testator's brother, A. J. Ring, was nominated as executor and filed the will for probate.

Objections to the probate of the will were filed by Mary Ring Kelly, surviving sister of the testator, on the grounds that decedent was of unsound mind, incapable of making a will, and that the purported will was procured by fraud, duress, and undue influence of A. J. Ring. The objections were controverted by the proponent, A. J. Ring. Trial was had to a jury. At the close of contestant's evidence the court sustained proponent's motion for a directed verdict both as to the issue of testamentary capacity and that of fraud, duress, and undue influence. Judgment was entered accordingly from which the contestant appeals to this court.

Subsequent to the perfecting of the appeal as aforesaid the contestant filed a petition for a new trial, pursuant to the provisions of Rules 252 and 253 of the Rules of Civil Procedure which asserted that, following the trial herein, Andrew J. Ring, the proponent, died on November 28, 1945; on December 3, 1945, his will was filed and on December 10, 1945, it was admitted to probate; it was signed on the same date as that of Thomas S. Ring, to wit, April 5, 1933, was witnessed by the same parties, whose names appeared in the same order as on the alleged will of Thomas S. Ring, and substantially the same disposition was made of his property by Andrew J.

Ring as that made by Thomas S. Ring; that such newly dis-
covered evidence is most persuasive to show undue influence
on the part of Andrew J. Ring; that contestant used all due
diligence to discover the evidence but did not learn thereof
until December 3, 1945. Trial was had on the petition for
new trial. The court determined that the newly discovered
evidence would be insufficient to justify the submission of the
issue of undue influence to a jury and denied a new trial.
Contestant appealed from such ruling and the proceedings on
such appeal have been consolidated in this court with those
involving the will contest.

I. While several questions are presented by this ap-
peal, the decisive issue would appear to be whether the court
erred in overruling proponent's motion for a directed verdict
on the issue of testamentary capacity. Obviously, a decision
of this question requires a very extensive review of the evi-
dence introduced at the trial.

Tom Ring was a bachelor. The only members of his im-
mediate family who survived him were his brother, Andrew J.
Ring, the proponent, and his sister, Mary Ring Kelly, the con-
testant. Two other brothers and his parents predeceased him.
Mary Ring lived on the Ring farm with her parents and her
brothers until she married in 1894, when she and her husband
moved to Greencastle. Thereafter she frequently visited her
brothers on the farm. After the death of the parents, Tom
Ring, Andrew Ring, and their brother John, lived on the farm.
From 1899 to 1916, Mrs. Nellie Cain was their housekeeper on
the farm. During this time, about 1906, Tom Ring was taken
to St. John's Mercy Hospital at Davenport, Iowa, and from
there to St. Bernard's Hospital at Council Bluffs. He received
mental treatment. About a year transpired during which he
was at one or the other institution. From 1908 to 1926 Tom
and Andrew Ring lived on the farm. In 1926 and 1927 the
farm was operated by a tenant and Tom and Andrew lived
at Kellogg. Thereafter, they returned to the farm and lived
upon it until 1936. They were living on the farm on April 5,
1933, when both executed wills substantially identical as to
their provisions. About 1940 Tom Ring entered the Jasper
County Home and lived there the remainder of his life. While

he was at the County Home Tom Ring suffered from Parkinson's Disease, or paralysis agitans, or shaking palsy, a physical disease, which usually afflicts people past thirty-five years of age. Immediately before his death it was necessary to perform an operation for the removal of his prostate gland. He died thirty-six hours after the operation.

Contestant's first witness was Charlie Butcher. At the time of the trial he was custodian of the Jasper County Bank and constable of Newton township. He was the tenant who farmed the Ring farms in 1926 and 1927, while Tom and Andrew Ring lived in Kellogg. The Ring brothers were at the farm nearly every day. Butcher testified that Tom Ring used to stay at the farm sometimes for two or three days at a time, usually when Andy was going somewhere; Andy looked after the business; Tom never at any time said anything to Butcher about the renting of the farm; Tom was very unkempt and was hardly able to take care of himself; he was very quiet, never said anything unless you spoke to him; if you spoke to him he generally said ''yes'' to whatever the question was; he did not walk in an upright manner but walked with a stoop, looking at the ground, and with a shuffle; he was always talking to himself as he walked; in the house, he would sit in a chair and not say anything all evening unless you spoke to him; sometimes he would pick up a newspaper and read it, or pretend to; his mouth drooped and he had a faraway look in his eyes; he usually was unshaven unless it was Sunday when he was going to church; Butcher could not say that he ever saw Tom smile; did not think there ever was a change of expression on his face; if you spoke to him he did not look at you, hardly ever looked up off the ground; he would always look away from you; it was difficult to understand what he said; he never said but a few words at any time; he used to be talking to himself and there were very few words that you could understand; sometimes Butcher would ask him what he said and then he would stop talking, but he would jabber continuously when he was sitting in the room; he used profanity quite a bit; at meals, he would wait until they asked the blessing and then he would start to eat and did not

have any table manners; on one occasion they had canned salmon and Tom reached for the plate and took it all; Tom chewed tobacco all the time, it ran out the side of his mouth onto his clothes; Andy brought his tobacco to him; Tom did little work about the farm; he might carry a few ears of corn or go after the cows; Tom never said anything about religion or the church; he did not mention any of the Catholic organizations to Butcher; he talked about his relatives and carried a letter from Australia, dated somewhere in the Eighties, which he said was from a cousin or aunt; Tom never said a complete sentence that Butcher could understand; he never talked to Butcher or said anything in Butcher's presence about business; Butcher testified that in his opinion Tom Ring was definitely of unsound mind.

On cross-examination, Butcher testified that Tom knew his brother and his sister, never got lost, knew the farm that he had an interest in. Butcher stated that he considered Tom of unsound mind because of the fact that he sat all evening with the same piece of paper in his hand; was unshaven except on Sunday; always looked at the ground; had no interest in anything else around the place except looking on the ground; kept using the same profane expressions all the time; did very little work; did not transact business. He did not base his opinion of unsoundness of mind upon any one thing, but upon his general association with him.

Mrs. Nellie Cain testified that she kept house for the Ring brothers from 1899 to 1916. After she quit working there, she met Tom Ring only to pass him on the street or at church. From 1916 she saw him when she would come to visit from Davenport and attend church about once a year. She testified that on the day Tom was taken to Davenport in 1906 he went out into the cornfield to plow corn; he would drive part way down the field, turn around and come back; finally he tied his team to the fence, came into the house and went to the telephone; she went into the house and, as she did so, he went out the front door, ran down the road to the Atwood farm and telephoned from there; Father Tracy and Dr. C. C. Smead came out to the farm; Dr. Smead told them to put everything, knives, etc., where Tom could

not get hold of them; they got Tom ready and took him to Davenport to St. John's Mercy Hospital; he was not there very long; they brought him home and took him to St. Bernard's Hospital at Council Bluffs, a Catholic hospital for mental people; he was there all that winter; he ran away from St. Bernard's and came home, riding a train on blind baggage; he was home only a short time when they took him back; from the time they first took him to Davenport until he finally came home must have been a year; he was a man that would not talk to you; you would ask him a question, he would say "yes" or "no," but to sit down and have a conversation with you, he never did that; he never just came right out and talked real plain to you; he always mumbled to you; you could not understand most of the time what he said unless you asked him a time or two; she never heard him say complete sentences; if you asked him to get a bucket of cobs, maybe he would get them and maybe he would not; he did not talk when there was no one talking to him; he was always talking to himself or mumbling to himself; as long as she has known him, up until the time of his death, he appeared the same as he did when she saw him on the farm; his actions appeared the same; he walked with a shuffling walk; he did not look at you when you spoke to him; when he was sitting in the room, he would never look at you when you talked to him but would stare at the floor or across at the wall; she never observed him smile or heard him laugh; when you would speak to him, he would not look at you but just stare ahead of him and answer "yes" or "no"; she never heard him say anything about the farm or the business on the farm or anything about religion or the church; she never saw him take any interest in the crucifix or other Catholic statuary which might have been around the home; she did not see any change in him; saw him about once a year; if she passed him on the sidewalk at church, he recognized her but would not speak; he would not shake hands or anything like that; he always answered when she spoke to him, saying "yes" or "no"; he chewed tobacco, was not very tidy around the house with his tobacco; after he went

to bed, you could hear him talking through the night but could not understand him; he would be mumbling; after he was taken to Davenport and Council Bluffs he was about the same as before. Mrs. Cain testified that Tom Ring was of unsound mind. On cross-examination she testified that Tom knew and recognized her; she thought he knew and recognized his brothers; he knew the farm; he was never unkind to her or discourteous.

Mrs. Elizabeth Pink, a daughter of Mrs. Cain, testified that she lived with her mother at the Ring home from before 1900 to 1908 and corroborated her mother to some extent. Dr. F. S. Hill testified that he practiced dentistry at Kellogg from 1911. Tom and Andy Ring lived next door to Dr. Hill when they lived at Kellogg. He testified to some of the peculiarities heretofore reviewed and testified that he never saw Tom transact any business. Mrs. Hill also testified to some of the peculiarities heretofore recounted. James C. Balmer testified that he lived southwest of Kellogg, within three miles and a half of the Ring brothers; knew Tom Ring for twenty-five years. He corroborated some of the testimony previously reviewed. The court refused to permit him to testify as to Tom Ring's soundness of mind upon objection of proponent that no proper foundation had been laid.

John Kooistra testified that he lived about half a mile from the Ring farm and knew Tom for forty years. He corroborated to some extent the testimony previously reviewed. He always did business with Andy. Mrs. Mary Ring Kelly, the contestant, testified to a limited extent regarding the difficulty in conversation with Tom and the fact that he was taken to Davenport and Council Bluffs. John Healy testified that he had known Tom Ring for many years; felt sorry for him; Tom had a kind of empty stare; Healy never heard him engage in a conversation at any time, never heard him say anything more than "yes" or "no" or a grunt. On cross-examination, he reiterated his testimony as to Tom's empty stare, stoic expression, but also testified that at church he knelt down when the rest did and got up when the rest did, sat down when the rest did, just followed the crowd.

Walter Mackerman testified that he lived on a farm near

the Ring brothers' farm from 1911 until he moved to Newton; knew Tom Ring including the year 1933; as far as he knew Andy did all the business for the Ring brothers; Tom would not say anything to you unless you put a question to him; during threshing the men would go out under a tree and sit and visit; Tom would generally sit off a way, would have his head down, always was talking to himself, chewed tobacco and would have some on his lips and, once in awhile, on his chin; that condition existed during all the time he knew Tom.

George Morgan testified that he lived in the Ring neighborhood from 1932 to 1935; knew Tom perhaps for fifty years; in 1933 or thereabouts he saw him but did not contact him because he seemed to be sullen; he said very little; it was hard to detect how brilliant he might be; never heard him talk and make conversation; he did not say sentences; spoke in a low tone with his head down and cut his words very short; his eyes had a faraway look; he did not smile or laugh; in the early days he had a little expression in his face; he chewed tobacco; he had tobacco on his clothes.

Harry Engleman testified that he managed an elevator at Kellogg for fifteen years prior to 1929; did business with Ring brothers; did that business with Andrew; never did any business with any other member of the family; never talked to any other member of that firm about business; did $3,000 to $5,000 a year with them; knew Tom during that time; he was very quiet in temperament, never had anything to say, would not answer you, only nod his head; he had a rather blank expression on his face, always had his head down, kind of mumbling something but you could never tell what it was; if you said anything to him he would probably just nod his head or grunt a little; he did chores that Andy asked him to do, tried to do the chores.

Dolar Huff testified that he worked for the Ring brothers in 1932 and 1933; about April 1933, Tom was a chore boy around there; he kind of looked after the milk cows and things like that; worked in the field some; his appearance was kind of dull and he was dull acting; never saw him smile only just once in a great while; did not see him laugh; about all

he ever said was "yes" and "no"; he would talk to himself quite a bit; you could not understand what he said; he would mumble; he did not associate with other people a whole lot; when he was not doing chores, he was just sitting around in the shed chewing tobacco, seemed to enjoy that more than anything else; he talked to himself most when he was out doing chores, when he was out with the stock; never heard him say anything about church organizations or the church; slept in the bedroom with him; Tom did not have a rosary or any Catholic statuary around him; just the beads was all. Huff testified he was employed by Andy and never had any business dealings whatever with Tom in connection with his employment there; Tom never gave him any instructions about his work or orders about his work; he never saw any business transactions taking place in which Tom had a part. On cross-examination, he testified that Tom knew and recognized him, knew his brother Andy and other members of the family, recognized the Ring farm, milked cows sometimes, knew which cows to milk, knew what livestock the Rings owned and knew their property he had around the farm and the machinery in 1933.

Ed White testified that he lived on a farm practically across the road from the Ring farm in 1933; knew Tom and saw him about April 1933; had known him for years prior to that; Tom was very quiet; you had to approach him; he would not speak to you or approach you in any way; would sit around in the shed in the summertime, just mumble to himself or talk to himself, was odd in that respect; he did not make conversation that could be understood; that was a description of him in 1933 and prior years. Ed White assessed the Ring brothers as township assessor; he always had the conversation and did the business with Andy; Tom was quite often present but did not participate at all, only he would sign the roll as they got through; White would always check the line for him to mark; Tom would always start out to do whatever Andy would tell him; sometimes he would accomplish his task and sometimes he would not. White remembered one time when Tom went out in the field to harrow and just

drove his team in a circle until they came out and got him and took him to the house; Tom did the regular chores around the barn, would feed and water the calves, would take a long time but he seemed to have the patience; he would stand there and wait twenty minutes for a calf to drink; while he was standing there, he would just kind of step around, always mumbling to himself; Andy always gave the orders for whatever was done there. Various questions as to Andy's treatment of Tom were objected to by proponent and the objections were sustained. Objections to White's testifying as to Tom's soundness of mind were sustained on the ground that he had not detailed enough facts on which to base an opinion.

Merrill Atwood testified that he lived on a farm in the Ring neighborhood; knew Tom about April 1933; he apparently talked to himself all the time, mumbled, did farm work, very seldom went off the place; never saw him smile or heard him laugh or saw any change in his facial expression; he generally had his head down. Andrew Kelly, a son of the contestant, testified that he knew Tom from 1917 to 1939; during the years he was home, particularly about the year 1933, he did not think there was much difference with the exception of natural infirmity that would come with age; Tom would never answer a question any more than just a direct answer; did not carry on any kind of conversation; his expression was very vague and blank; he repeated words; he did not associate with other people.

Bert Turck testified that he lived about sixty rods from the Ring farm in 1932. He testified that he saw Tom around the barn, he was slow and easy like; Tom would just kind of mumble when he talked; he was not clean and tidy about his clothes.

Frank Young testified that he went to school with Tom and had known him ever since, including the years 1933 down to 1936; Tom would hitch onto a harrow and drive a little way and then unhitch and drive off, turn around, go back and hitch up again, and did that as many as four or five times; when driving three horses, if one horse would be ahead, he would slap the one behind or he would slap the one ahead; using a land roller, he would roll down and back in the same

spot about fifty feet back and forth. On cross-examination, he testified that the incident about using the land roller occurred about forty-five years before the trial; in watering a horse, Tom would stand there for half an hour or so; if the horse would hold his head down to the water and would not be drinking, Tom thought he was; Tom knew and recognized Young, recognized his brothers and sisters, knew his farm land, knew where to go when they told him, was familiar with the livestock on the farm and the machinery at times; would not say he did all the time.

Frances Klemm, a daughter of contestant, testified that she kept house for Tom and Andy in 1926 to 1928 when they lived at Kellogg; in 1932 and 1933 Tom just "kind of staggered along with you"; he would do anything you would tell him and you would not know whether he knew what you were talking to him about; he just mumbled an answer to you; he did not speak whole sentences; would say "yes" if spoken to but would not talk to you at all; never carried on a conversation of any kind, was awfully nervous, just shook, did not have table manners; at one time Tom gave the witness a check that was written on a closed bank in Kellogg; Andy took the check and handed him the money that the check amounted to; Tom never said anything about the property he had.

Todd Young testified that he lived about one hundred rods north of the Ring farm and knew Tom Ring during April 1933; he did not do much field work; Tom gradually got worse; he never did any of the business; John and Andy handled the business and when John left the farm Ring brothers' business was done by Andy; Tom never did talk very loud so you could hardly hear what he said; he was never one to carry on a conversation; he knew his brother Andy, was familiar with the farm, worked in the fields, never got lost; used to go to Kellogg on horseback to get chewing tobacco.

Dr. Edward C. McMurray, a practicing physician, testified that he had experience with mental cases. In answering a long hypothetical question, which was based upon the evidence heretofore reviewed, the doctor testified that, in his opinion, Tom Ring was of unsound mind about April 1933.

Four other doctors, Dr. Thomas D. Wright, Dr. John W. Billingsley, Dr. E. F. Besser, and Dr. R. F. Frech testified to the same effect in answer to the same hypothetical question.

On cross-examination Dr. McMurray testified as follows:

"In defining the term unsound mind I would say that a man is of unsound mind if he is unable to transact his ordinary business affairs and tend to his own business affairs and according to the hypothetical question that was asked it appears that this man was not able to transact these affairs and that he was not in full control of all of his normal mental faculties. * * * A general definition of unsound mind is any individual who would be unable to show the proper reaction to his environment or to his family or to his friends and his work, that would be in my opinion of unsound mind. That means he is of unsound mind if he is unable to transact ordinary business and is not like the normal average individual in the community. That is what I mean when I said that the man in the hypothetical case was of unsound mind."

He recited that symptoms of unsoundness of mind included the fact that Tom's brother handled the business transactions for the partnership, that Tom was not socially adapted to the family and friends, allowed tobacco to drip on his chin, was unkempt in his clothing. He further testified:

"The fact that during the later years he rarely went to his neighbors but largely stayed at home was to some extent a symptom of an unsound mind. It is hard to break these things all up into one particular thing and say that is or isn't a symptom but the whole pattern, taking all these things together, is what I was basing my conclusion on. The whole pattern is a result of the various specific symptoms but when you break them down they lose some of their importance. I think that even various symptoms which are not symptoms of unsound mind may be symptoms of unsound mind when taken as a whole * * *. Alienists take the whole pattern of the individual's behavior as showing whether he is normal or abnormal in mental condition."

On cross-examination, Dr. Wright testified as follows:

"Soundness of mind is a matter of the sum total of the different aspects of conduct. Any one thing is not a matter necessarily of unsoundness of mind. Individual aspects would not have to be subnormal in order to make or show mental incompetency. For this reason any one thing in itself may not mean unsoundness of mind but the aggregate put together might. All of the facts would be normal and yet taken together they would show that he is of unsound mind."

On cross-examination, Dr. Frech testified as follows:

"A person is of unsound mind who is not capable of managing or performing the ordinary tasks of life, particularly concerning themselves and their business. * * * It is possible that a person of unsound mind would know and recognize his relatives and his friends. It is possible that a man of unsound mind would know and recognize his farm that he owned and the livestock and machinery that he owned."

There was a great deal more testimony, of course. The foregoing summary is merely intended to illustrate what the testimony was. This court is obligated to view the testimony in the light most favorable to the contestant when considering the correctness of the court's ruling on proponent's motion for directed verdict. When the testimony is so considered, we are of the opinion that the court was in error in directing a verdict against the contestant.

II. Many authorities have been cited by counsel on both sides. In cases of this character the facts developed as to each decedent are never identical. In the cases heretofore decided by this court it is difficult to find one where the situation disclosed was even analogous to that presented by this record. Hence it is that we have often emphasized that the facts of a particular case are often controlling as to our decision therein and decided cases are important primarily for the purpose of illustrating basic principles to be applied to the particular facts at hand.

Counsel for proponent emphasize numerous decisions wherein we have held that the condition of decedent's mind at

the precise time that his will was executed is decisive on the question of mental competency. Such cases usually pertain to decedents who were in early life strong, vigorous, alert, and sound mentally but in later life began to show signs of mental decay. In many such cases, the decedent had lucid intervals and intervals when he was unbalanced. In such a case it is vitally important to determine whether the will was executed during a lucid interval. Hence the precise period of time during which the will was executed is controlling and testimony of conduct at times quite remote from the execution of the will is often of relatively little or no importance.

But the testimony herein is to the effect that Tom Ring's condition did not vary appreciably over a period of many years. It remained the same. As to such a person the precise time at which the will was executed is not so vital and testimony as to conduct at times quite remote from the time that the will was executed nevertheless may be relevant and material. This is illustrated by the case of In re Estate of Wharton, 132 Iowa 714, 718, 109 N. W. 492, 494, wherein we stated:

"As to the objections made to the evidence on which the instruction was based it is sufficient to say that the testimony of witnesses for contestants covered a connected period from a time prior to the execution of the will when testator received a severe injury down to the time of his death, and it was entirely proper to thus cover the whole period, for the evidence tended to show that, after the time the injury was received, testator exhibited symptoms of unsoundness of mind, which might be referred to the continuing result of the injury, combined with advancing age. It would not be difficult to cite many cases in which testimony as to mental condition at a period long subsequent to the execution of a will has been held competent, it appearing that the condition testified to has been continuous. See, particularly, Ashcraft v. De Armond, 44 Iowa, 229; Bever v. Spangler, 93 Iowa, 576."

By reason of the fact that Tom Ring's condition was shown to be continuous, with practically no change for about

thirty years prior to the making of the will on April 5, 1933, the proponent's contention that much of the testimony related to times too remote from the execution of the will to be persuasive is not well taken. For the same reason the fact that the hypothetical question did not include specific dates would not warrant our disregarding the medical testimony herein.

III. Counsel's contention that, since numerous witnesses testified that Tom Ring knew and recognized his brother and sister, knew his farm, the livestock thereon, machinery, etc., he had sufficient mental capacity to make a will cannot be sustained as a matter of law. In determining whether a jury question was presented on this issue, consideration must be given not only to the evidence bearing on testator's ability to recollect and know the extent of his property and the natural objects of his bounty but also the evidence bearing on whether he knew and comprehended the effect of a will and the manner in which he wanted his property to be distributed. Manatt v. Scott, 106 Iowa 203, 215, 216, 76 N. W. 717, 68 Am. St. Rep. 293; Barry v. Walker, 152 Iowa 154, 159, 160, 128 N. W. 386, 388; In re Estate of Grange, 231 Iowa 964, 976, 2 N. W. 2d 635, 642.

In Manatt v. Scott, supra, we approved an instruction which advised the jury:

"Weakness of intellect, whether it arises from extreme old age, from disease, or great bodily infirmities or suffering, or from all these combined, may render the testator incapable of making a valid will, providing such weakness really disqualifies her from knowing or appreciating the nature, effects, or consequences of the act she is engaged in."

In Barry v. Walker, supra, we approved an instruction which advised the jury:

"A party competent to make a valid will should possess a mind capable of exercising judgment, reason, and deliberation, a mind capable of weighing the consequences of his will and its effects to a certain degree upon his estate and family, and all persons devoid of such reason are incompetent to make a valid will."

In In re Estate of Grange, supra, we stated:

"The jury had a right to consider that the disease was progressive and permanent and continued over the period during which her will was drawn and signed; that there was no lucid interval throughout that period; that she was not in a condition to recollect and know the extent of her property and the natural objects of her bounty, or to know and comprehend the manner in which she wanted to distribute her property, or the nature and claims of those who were excluded from participating."

Of course, other decisions of this court could be cited to the same effect.

Pursuant to the authorities here reviewed, we hold that contestant made out a prima facie case for the jury to decide on the question whether Tom Ring, on April 5, 1933, had mental capacity to know or appreciate the nature, effect, or consequences of the act of making a will, could exercise sufficient judgment to weigh the consequences of his will and its effect on his estate and family, could comprehend the manner in which he wanted to distribute his property. The testimony bearing on this question is, to some extent, circumstantial. As some of the doctors testified, many of the symptoms taken alone would be insufficient but, considered as a whole, the jury could have found that such testamentary capacity was lacking. As stated in Duggan v. McBreen, 78 Iowa 591, 594, 43 N. W. 547, 548:

"None of these facts, considered alone, would establish testamentary incapacity, and all of them, taken together, may not; but we think their weight should have been submitted to the jury for determination."

 IV. In addition to the issue of testamentary capacity, contestant also raised the issue of fraud, duress, and undue influence on the part of A. J. Ring, proponent. This issue is augmented by certain matters presented by the appeal from the order denying a new trial. It is, of course, proper for this court, where the record warrants it, to reverse a case as to one issue and affirm it as to other issues. It is the general rule,

however, that where a new trial is granted it should be awarded as to the whole case. Bond v. Wabash, St. L. &. P. Ry. Co., 67 Iowa 712, 717, 25 N. W. 892; Seevers v. Cleveland Coal Co., 166 Iowa 284, 291, 147 N. W. 761; Waterloo, C. F. & N. Ry. Co. v. Burrell, 184 Iowa 689, 697, 169 N. W. 53; Keller v. Gartin, 220 Iowa 78, 86, 261 N. W. 776. We hold that the general rule should apply herein. In so holding we are influenced somewhat by the fact that, in appellant's argument on the appeal from the order denying her petition for a new trial, certain contentions are advanced which were not emphasized on the trial of the will contest. Appellant contends that, where a proponent sustains confidential relations with the alleged testator, drafts the will or controls its drafting, such facts, considered with evidence of lack of testamentary capacity have an important bearing on the issue of undue influence. Additional evidence may be available on a retrial of this case, particularly as to Andrew's participation in the determination of the provisions of the will. Accordingly, we will not prolong this opinion by a discussion of the question whether the rulings of the court were correct as to the issue of undue influence, but determine that, without passing thereon, the reversal herein shall be as to the whole case.

V. Contestant complains of several rulings on the introduction of evidence. Upon a retrial of the case, the precise questions may not occur again. Hence we do not undertake to pass upon the correctness of such rulings.

The cause is reversed and remanded for a new trial upon the whole case.—Reversed and remanded.

BLISS, C. J., and OLIVER, HALE, GARFIELD, SMITH, MANTZ, and MULRONEY, JJ., concur.

WENNERSTRUM, J., not sitting.