IN RE ESTATE OF DAVID FITZGERALD.

No. 42724.

MARCH 12, 1935.

REHEARING DENIED JUNE 21, 1935.

Burton Russell, Gordon B. Russell, and Harry Wifvat, for contestant.

White & Clarke and George J. Dugan, for proponent.

ALBERT, J.—To a fair understanding of the questions involved, the following is taken from the record:

The deceased, on October 24, 1925, made what purported to be his last will and testament, in which he placed his property in trust, directed the payment of certain legacies, among which was a bequest to St. John's Catholic Church of Adel, Iowa, in the sum of $1,000, provided how the trustees should handle his property and what disposition should be made of it, and made numerous other provisions in relation thereto. On February 19, 1932, deceased made what purported to be another will, in which he provided, in the first article, for the payment of all his just debts, expenses of his last sickness, and costs of administration; in the second article: "I give, devise, and bequeath, all my property, both real and personal and wherever situated, to Patrick D. Fitzgerald, my son, to have and to hold absolutely;" and in the third article he nominated his executor. On November 29, 1932, the deceased executed a codicil reciting as follows: "I, David Fitzgerald, of Adel, Dallas County, Iowa, being of sound, disposing mind and memory, do hereby make, publish and declare the following Codicil to my Last Will of October 24, 1925, hereby confirming the said Last Will of October 24, 1925, in all respects except as changed by this Codicil." This codicil further provided that, as he had paid the $1,000 to the Catholic Church during his lifetime, the provision in his former will bequeathing said $1,000 to the Catholic Church "is hereby cancelled and held for naught," and he directed his executor or trustees to ignore the said item in the will in the settlement of his estate.

David Fitzgerald died on the 6th day of April, 1933, at the age of eighty-four years. On the 10th day of April, 1933, a petition was filed for the probate of the first-named will, to wit, the one bearing date of October 24, 1925, and the codicil dated November 29, 1932. On the same day, Patrick Fitzgerald filed in the office of the clerk of the Dallas county court, what he claimed to be the last will and testament of the deceased, the same being dated February 19, 1932, and filed petition for the probate of the same. To each of these petitions for probate objections were filed.

The original will, under date of October 24, 1925, is designated in the record as Exhibit A, and the codicil to said will is designated in the record as Exhibit B. The alleged will of February 19, 1932, is designated in the record as Exhibit 1. They will hereafter be referred to as exhibits.

The objections to Exhibit 1 were, first, the denial of due execution thereof; and, second, the allegation that the codicil (Exhibit B) was duly executed, and that by reason thereof Exhibit 1 was completely canceled and revoked, and the former will (Exhibit A) was reinstated. The objections to Exhibits A and B were, first, that Exhibit 1 revoked and canceled Exhibit A; and, second, that the pretended codicil did not revive Exhibit A. These last objections were amended by alleging that at the time the said codicil was executed David Fitzgerald was mentally incapacitated and incompetent to make said codicil; and by later amendment it is alleged that David Fitzgerald was unduly influenced in making said codicil by persons some of whom benefited by said will and said codicil. Later, after several other motions, a motion was made to consolidate the hearings on both of these petitions for probate. This motion was overruled, and the previous motion to strike the instrument Exhibit 1 was sustained, " * * * but that the same shall be without prejudice to the rights of the contestant, and this ruling shall not deprive contestant of any rights that he may have to hereafter offer said instrument for probate or for such other proceedings as may be necessary in court."

As the record thus stands, the question left for determination is the validity of Exhibits A and B. There is no question in the record but that Exhibit A was duly executed as provided by law. This, then, leaves only the question as to whether Exhibit B (the codicil) was duly executed, and the question of undue influence and mental incapacity in the execution of the same.

The case was tried to a jury. At the close of the testimony, under a direction of the court, the jury returned a verdict that Exhibits A and B were duly executed and "is the last will and testament of David Fitzgerald."

The contestant first complains because Exhibit 1 and the allegations in connection therewith were stricken out. While it is possible that the question of the validity of both of these wills might have been tried out in one action at the same time, to the clarity of the situation and to the end that the jury might not be confused in

considering the same, what the court did was probably best. Whatever rights the beneficiaries under Exhibit 1 had are protected and reserved to them in the ruling by the court heretofore set out.

Without now stopping to make further reference, it must be said that there is no evidence whatever ·in the record on which to base a charge that the codicil (Exhibit B) was procured by undue influence.

The real question tried out was as to the mental capacity of David Fitzgerald at the time said codicil was executed. It might be here said that in the trial of the cause the court permitted the introduction and proof of the due execution of Exhibit 1 as a matter of evidence for a limited purpose.

The contestant Patrick Fitzgerald (the son) testifies in substance that he is fifty-six years of age, married, and has one child, by adoption. His mother died when he was a baby, and he later lived on a farm with his Uncle Michael, where they "batched" until the uncle's death in 1904. He spent one year at Iowa City at school. He later lived with his father, and they moved to Adel and lived at a hotel. When he was married, his father continued to live in town at the hotel, and he and his wife moved to a farm northeast of Adel. The father later got a small house on the main street, where he lived for a few years. Later the son moved to town. Along about Christmas of 1930, the father had been sick, and later moved up to live with his .son, where he continued to live until he died. "I noticed a change in him mentally and physically in the summer of 1932. I noticed peculiar actions on the part of my father. He took the newspapers and would hide them. Later on, he had an overcoat I bought him, and he said that the priest brought it over from the old country for him. I heard him tell this to others." The witness described certain acts of uncleanliness, and said that the father was naturally of very cleanly habits, but in July, 1932, he became careless, and was unable to control the action of his bowels and bladder, and therefore was dirty, and wet his clothing and refused to change the same; would assert that it was already clean, and said, when urged to change to cleaner clothes: "Oh, you are too clean around here. That is all that is the matter with you folks." Clean clothing was always furnished him and was ready for his use. He would read pieces from the newspaper regarding modern railroading, and would say: "Well, that is just the way we used to do in olden days, we railroaders." "My father was a railroader about fifty years back.

He was hurt in a wreck. He was injured in his head and his leg. He had quite a scar on his head." On one occasion the witness took his father down to the furniture store and he (the father) told the merchant that he wanted to buy some furniture to furnish a house, said he was going to get married. In early life he was a very religious man and did a great deal for the church. Witness noticed a change in that particular in October or November, 1932. "Father got very radical against the church. He didn't go to church. He swore a good deal, and said the church wasn't going to get any more money from him. This was in October, 1932. I noticed a change in his memory along in the summer, and also in his lack of recognition of acquaintances and friends. He would meet people who had worked for us for years and he wouldn't know them until they would tell him who they were. This occurred a good many times." The witness says: "I give it as my opinion that his mind was unsound on November 29, 1932," basing his opinion on the matters he had testified to. On cross-examination he said:

"Father did not recognize Frank Steaver and George De Vore, and men who had worked for him. I thought he was crazy because he did not recognize them. I think he was. I could not give the exact dates I observed these things about my father, or heard these things. I paid no particular attention to it at the time, only I knew he was failing, and I tried to be with him, and take him around as much as I could. He was feeble and walked with a cane. Outside of the infirmities of old age, until the summer of 1932, I did not see a great deal. He was sound and all right before that. He had been failing, of course."

On recross-examination this witness says, after describing the farm owned by the deceased:

"Father collected the rent when he could get it. He did that with all his property up until the time of his last sickness."

The next twelve witnesses for the contestant testify to acquaintance with the deceased, some of his peculiarities incident to old age, loss of memory and failure to recognize them when they had had many years of acquaintance with him, and that they noticed some change in him physically and mentally during the latter years of his life; but none of them expresses any opinion as to whether or not he was of sound or unsound mind.

Dr. Scott testifies that he was acquainted with the deceased for at least thirty years, and that he was his attending physician. During that time the deceased had a number of infirmities. He had double hernia and wore a truss continuously, and had a bad leg, resulting from a railroad accident years before. He had pleurisy, chronic bronchitis, some stomach trouble, colitis, and sometimes diarrhea. At the time of his death he had hardening of the arteries.

"He had been afflicted with hardening of the arteries as long as I knew him. It is a slow process, but he was gradually getting worse. Physically and mentally he was growing more feeble all the while. As I think it over, he went down rather rapidly within, well, almost the last year. He went down rather rapidly, especially the last few months, the last six months maybe, of his life, he went down very rapidly. The change was gradual. That began probably less than a year, maybe ten months, or nine months before he died. He gradually went down, and the last five or six months he failed very rapidly. He became senile following probably about seventy. There are some changes that go on in every old man, sort of an adjustment between the organs and the glands of the body. At the beginning senility, and then he developed extreme senility, and probably that merged into what I could only call senile dementia. Just when he became a senile dementia subject is very hard to answer. It is a gradual process, a gradual loss of mind, and that would later bring about a complete loss of mind. That condition became pronounced in David Fitzgerald about ten months before he died, maybe within six months of the time he died, five or six months, he would be what I would consider as having senile dementia. That is an impairment and derangement of the mind that grows progressively worse, particularly in cases of what we call arteriosclerosis. I know he was very irrational on some matters, at least it seemed that way to me, without any basis, a false conception of things that happened, and couldn't be argued out of, a delusion, I wouldn't know how else to figure it."

With reference to his condition on the 29th of November, 1932, he was asked to say whether or not David Fitzgerald had mentality enough to form an intelligent action and would be able to realize the extent of his property. The answer was:

"Well that might depend upon whether a man was aroused from his lethargy, or his mental incapacity to realize anything, to

realize that or not. Whether that could be done, or not, in this case, it is practically impossible so say. My opinion would be he was not."

Basing his opinion on his observation and his knowledge of the condition of the deceased on the 29th of November, 1932, he said:

"Well, he certainly was not of healthy mind at that time, more or less unbalanced, and unsound. Yes, he was of unsound mind."

His cross-examination in some ways weakens the opinion that he gave.

The last time he saw David Fitzgerald prior to November 29, 1932, was on November 23, 1932, and he did not see him again until December, 1932. He says that as to an October (1932) visit:

"David Fitzgerald was not rational. His condition was progressive and would continually get worse. By unsoundness of mind I mean there is a loss of mind, which we call impairment of mind, and there is derangement of mind. In time the mind will become completely obliterated in that way."

Dr. Braddy, who was a witness to Exhibit 1, testifies that, when said exhibit was made, Fitzgerald was of sound mind, although he was not calling upon Fitzgerald professionally at the time when Exhibit 1 was executed. He testifies that he left Adel in December, 1932, and attended Fitzgerald up to that time."

"His physical ailments were infirmities due to old age, largely. Confining my testimony to before January 19, 1932, physically he was an old man, with lowered resistance. Mentally he was not as rapid as he had been in youth, but there wasn't anything physically or mentally, as an organic disease, up to February 19, 1932. My answer is modified to say that the organic conditions present were those attendant upon his increasing age. I cannot say as to whether his blood pressure indicated any organic physical or mental disorder. He had hardening of the arteries, as you would expect in a man of his age. Found no chronic colitis. He had chronic stomach trouble, attendant upon age; nothing abnormal, particularly. Mental disorder is not an offspring of this condition as a rule. David Fitzgerald did not have senile dementia prior to February 19, 1932. Referring to the time prior to that date, would say he walked with care, got around, have seen him downtown transacting some busi-

ness. Up to that time would say he was able to understand what his property was, the natural objects of his bounty, and was able to dispose of his property in a rational manner. Senile dementia may come on suddenly or progressively, may be either; usually progressively."

Mary Fitzgerald, the wife of Patrick, confirms much of the testimony of her husband, relates many circumstances that occurred while David lived at their home, and says that, in her opinion, David Fitzgerald's mind was unsound on November 29, 1932.

The proponent introduced thirteen lay witnesses, some of whom testified to business transactions with the deceased up to a short time before his death. A number of them had been his acquaintances for many years, and frequently came in contact with him, either in a business way or socially. Some of them testified in terms that he was of sound mind at the time in question. Others testified to business transactions and dealings with him that show that he was of sound mind.

Dr. Mershon, a practicing physician in Adel, testifies that he has practiced in Adel for thirty-three years; that he is a member of the insanity commission of Dallas county, and has been such for more than three years. He knew David Fitzgerald for thirty years. He talked with him, and observed him on an average of about once a month during the fall and winter of 1932, and once or twice in the spring of 1933. "Nothing attracted my attention affecting his mental condition." A hypothetical question was submitted to this doctor, assuming certain facts and making reasonable deductions from certain parts of the evidence in this case, and he gave as his opinion that on November 29, 1932, David Fitzgerald was of sound mind. On cross-examination this witness says:

"If a man is eighty-four years of age and has senile dementia, if it is severe, he would not be able to comprehend the extent of his property. If he had delusions with senile dementia and was forgetful, I would not expect he would know the extent of his property. If such a man has colitis, chronic stomach trouble, is unclean, seems to have no control over his bowels, would walk around with movements left on the floor, and would go to the kitchen, open the door, and urinate on the back porch, I would say he had symptoms of unsoundness of mind. I would not have any hesitancy in saying he was of unsound mind."

Later, on recross-examination, referring to this same state of facts, he modified this to the extent of saying: "I would say he was not of very sound mind. I did not see David Fitzgerald in October, November or December 1932."

At the close of the testimony proponent made a motion to direct a verdict in his favor, which was sustained and, under order of the court, the jury returned a verdict that Exhibits A and B "is the last will and testament of David Fitzgerald". This was followed by a motion to set aside the verdict and for a new trial, which was overruled.

We have not attempted to set out in detail all the testimony in the record, but have given the substance of the material testimony.

The question at this point for determination is whether or not the court erred in thus directing a verdict. The best test we know of for determining such a question is whether or not, had the case gone to the jury and it had found adversely to what it did in this case. the presiding judge would feel that, under all the record in the case, he would be warranted in setting aside such verdict.

It is one of the fundamental rules laid down by our cases that the burden of proof is on the contestant to show that the deceased did not have sufficient mental capacity to comprehend the nature of the instrument he was executing, to recollect the property he meant to dispose of, the objects of his bounty, and the manner in which he wished to distribute his property among them. Our last expression on this proposition was in In re Will of Johnson, 201 Iowa 687, 207 N. W. 748. Mere old age, or some deterioration in physical or mental power, peevishness, childishness, or eccentricity, is not sufficient to carry to the jury the issue of mental unsoundness of the testator. Such was our pronouncement in In re Estate of Shields, 198 Iowa 686, 200 N. W. 219, and cases there cited. We further said:

"It is not the duty of the court, in disposing of a motion for directed verdict, to submit the case to the jury because there is some evidence introduced by the party having the burden of proof, unless that evidence is of such character that it would warrant the jury in finding a verdict in favor of the party introducing such evidence. Before the question is left to the jury for its determination, the preliminary question for the court is whether there is any evidence to support the verdict, and if so, whether, upon such evidence,

the jury can find a verdict for the party producing it, that will stand."

In the case of Bishop v. Scharf, 214 Iowa 644, 241 N. W. 3, we stated the rule thus:

"It is not sufficient to impeach the validity of the instrument merely to show that testatrix had cerebral hemorrhage in the front part of the brain on the right side; that her mentality was to some extent weakened and impaired; that she had defective memory; that she was unable, upon all occasions, to recognize her acquaintances and friends; that she manifested some change from the quiet dignity and culture formerly observed to an altered personality and an inclination toward facetiousness and, to some extent, indifference to the character of her speech and conversation.

"The test of mental capacity has been many times stated by this court. Testamentary capacity exists if the testator has sufficient mentality to understand the nature and purpose of the instrument about to be executed, to remember and possess sufficient capacity to know the extent and nature of his property; to know and comprehend the distribution which he desires to make thereof, and to remember and know those having claims upon his bounty. Capacity to transact business generally, to make contracts and to carry on difficult negotiations are not essential to testamentary capacity. [Citing cases.]

"Mental weakness due to disease does not deprive one of testamentary capacity until it has progressed to the extent that the power of intelligent action has been destroyed. Mere forgetfulness and enfeeblement of the body are not alone sufficient to disqualify one from making a will. The disqualification which deprives one of testamentary capacity must exist at the very time of the execution of the instrument."

These are fundamentals which must underlie the determination of this case. We have carefully read the record in this case in the light of these rules, and it is our conclusion that the contestant failed to sustain his burden of proof and that the ruling of the district court was right in directing the verdict as it did.—Affirmed.

ANDERSON, C. J., and KINTZINGER, DONEGAN, HAMILTON, and PARSONS, JJ., concur.