IN RE ESTATE OF JOHN D. MEYER.

CLARA MEYER et al., Contestants, Appellants, v. FRED HULLEY, Proponent, Appellee.

No. 47395.

(Reported in 37 N. W. 2d 265)

MAY 3, 1949.

REHEARING DENIED SEPTEMBER 23, 1949.

F. S. Finley and Harold F. McLeran, both of Mount Pleasant, for appellants.

McCoid & McCoid, of Mount Pleasant, and Donald J. Bell, of New London, for appellee.

MULRONEY, J.—The heirs of John D. Meyer (his sister and the descendants of his two deceased sisters) objected to the probate of his will on the sole ground of lack of testamentary capacity. At the close of the contestants' case the trial court directed the verdict for proponent, the named executor in the will. This appeal by contestants presents the issue as to the sufficiency of their evidence showing or tending to show that John D. Meyer lacked testamentary capacity at the time of the execution of the will on August 11, 1943. The issue requires a review of the record.

The will left all real and personal property to Anna Meyer, decedent's wife (who had predeceased him by a few months) and named her brother, Fred Hulley, as executor without bond. In the last paragraph the decedent recognized that his wife was "mentally incompetent" and named Fred Hulley as the guardian of her person and property and fixed his compensation as guardian in the sum of $2000. Whatever might be said of this clause as an attempt to create a testamentary guardianship—something apparently not sanctioned by the law of this state—it has some significance here as showing decedent's knowledge of his wife's mental illness at the time he executed the will.

The record shows decedent's wife was mentally unbalanced at least during the year 1943 and was committed to an institu-

tion just before Thanksgiving in 1943, where she remained until her death early in 1946. The record also shows a guardian was appointed for the person and property of the deceased in December of 1943 and decedent was declared insane by the Commissioners of Insanity of Henry County in November of 1946 and committed to the Mount Pleasant hospital where he died in December of 1946.

John D. Meyer was born in 1869 and lived on a farm in Des Moines County, Iowa. He received a public school and business college education and for a time was a township assessor. He married Anna Hulley but the couple had no children. The Meyers left the farm and moved to New London about 1917. Witnesses described Mr. Meyer as a neat, careful, methodical man who kept careful accounts and was thorough in the handling of his business affairs. His business after he moved to town probably consisted of managing his two farms and the purchase of stock, bonds, and bank certificates of deposit. The guardian's inventory in December of 1943 lists two farms of the total value of $9000, the New London home valued at $4000, one mortgage, two bank certificates of deposit, one share of stock, forty-eight United States savings bonds, cash, and other personal property all of the value of about $39,000.

Contestants list about a dozen incidents and items of evidence which they describe as "pointing toward senile dementia" and which they argue were sufficient to raise a jury issue upon the question of testator's lack of testamentary capacity on August 11, 1943, the date the will was executed.

Mr. Brenneman, the cashier, and Mr. Eckey, the assistant cashier, of the Farmers State Bank of New London, Mr. Cullen, the vice-president of the National Bank of Burlington, Mr. Swiler, the cashier of the Burlington Savings Bank, and Mr. Vance, an attorney in Mount Pleasant, all testified to incidents in 1942 and 1943 regarding decedent's many claims of lost certificates of deposit. Mr. Brenneman said decedent and his wife each owned one share of stock in the New London bank and had done a general banking business with the bank since his election as cashier in 1910. He said he noticed a change in Mr. Meyer in the Fall of 1942, when Mr. Meyer was seventy-three years old, which he described as "forgetful and confused

at times" and "untidiness" and "a general appearance of 'slipping'." He said "sometime in the forepart of 1943 he advised me that he had lost his certificates—and there were several certificates aggregating $5000. He told me he could not find them. They were certificates on my bank. They were found later. I had some correspondence with the bank at Burlington about his (Meyer) losing certificates. Mr. Meyer talked to me about losing these certificates and I wrote a letter on January 16, 1943, to Mr. Swiler, cashier of the Burlington Savings Bank regarding some certificates he had presumably lost. Prior to that time I had no difficulty with him losing certificates." Mr. Brenneman said Mr. Meyer had an indemnifying bond blank with him which the Burlington bank had probably given him and he enclosed the executed bond with his letter. A day or two later the Burlington certificates were found and Mr. Meyer and an attorney, Mr. Bell, brought them to Brenneman and Brenneman called Swiler and then informed Meyer that the new certificates had already been issued. He told of Meyer and his attorney, Mr. Bell, coming to the bank on July 7, 1943, when a consolidation of a number of certificates on his bank, aggregating $5398.02, was made and one new certificate for the whole amount issued. He said he had a number of talks with Mr. Bell about appointing a guardian for Mr. Meyer and on June 14, 1943, he, as notary public, swore Mr. Meyer to a voluntary application for Appointment of Guardian. He said he felt, from his experience with Mr. Meyer, that he needed a guardian. He said Mr. Meyer had a checking account in the bank and the account remained active and checks signed by Mr. Meyer were cashed until the guardian was appointed in December 1943. He identified four checks for dental work, taxes, insurance, and cash that went through this account between September and December of 1943. He said he prepared a farm lease for Mr. Meyer on October 21, 1943, which Mr. Meyer and his tenant executed in his presence.

Mr. Eckey, who had known Mr. Meyer since about 1925 or 1926, told much the same story about Mr. Meyer making a nuisance of himself over lost certificates. He said he noticed a change in Mr. Meyer about 1942 which he said was "a slowing down in his ability to do business * * * forgetfulness or absent-

mindedness." He said the bank account remained active until December 8, 1943, with deposits of rent checks and interest and checks drawn against the account.

Mr. Cullen stated he first became acquainted with Mr. Meyer in 1938 or 1939. He said he had many conversations with him, especially in 1941 and 1942, mostly in regard to his time certificates that he had in the bank. He said "he would get a time certificate and then in a few days he would be back and think he had lost it * * * he would be back many times wanting a duplicate certificate only to find later he would find the certificate some place." He said on one occasion a duplicate was issued to him but finally he suggested to Mr. Meyer that he cash the certificate and buy war bonds and this was done. He said he handled the purchase of the war bonds for Mr. Meyer; that Mr. Meyer drew the checks for the purchase on his checking account in the bank and this checking account was retained and checks were cashed against the account. He said Mr. Meyer had a safe-deposit box in the bank and he once went with him to the box to search for lost certificates and there found a certificate on the other Burlington bank pushed back in the box with other papers. This was the lost certificate for which Mr. Brenneman had helped secure the duplicate. He said Mr. Meyer was well-dressed and neat appearing most of the time; that he last saw him in 1943 and that he was "certainly more confused or seemed to be having lots more difficulty taking care of his affairs when I last knew him than he did when I first knew him." He said that Mr. Meyer when reporting a lost certificate knew he had two certificates against the bank.

Mr. Swiler testified that he had known Mr. Meyer since 1938; that he had a C.D. account from 1938 to 1944, the high point being $6306 and he described the issuing of the duplicate certificate after receiving Mr. Brenneman's letter. He said Mr. Meyer had earlier executed an indemnity bond for the issuance of the duplicate. He said that Mr. Meyer was concerned over losing the certificate but it was the same concern one would normally expect from one who had misplaced a certificate, and he took an indemnifying bond on Meyer's own signature without collateral or other security.

Mr. Vance, who had known Mr. Meyer since 1928, said he came to his office in 1942 and told him about a certificate on a Burlington bank that he had either lost, misplaced or destroyed and he was wondering how he could get his money. He said Mr. Meyer was agitated, concerned and upset and he "was confused and he wasn't able to comprehend what * * * he had to do * * * in order to get his money * * * or get them duplicated." He said: "I told him if he couldn't find the certificates it might be necessary to give an indemnifying bond for the lost certificates."

Mrs. Stanley, the housekeeper since 1942 for an elderly gentleman who lived next door to the Meyers, testified she did not have any conversation with Mr. Meyer but she saw him around the yard. She said she could not describe his appearance but she thought his physical appearance changed for the worse in the years after 1942. Once when he delivered a basket of pears her employer had bought he stumbled on the cellar stairs. She said he had a good garden in 1942, a fair garden in 1943, and a poor garden in 1944. She saw Mr. and Mrs. Meyer sitting on the porch but never saw them converse and she never saw them have any company or visitors. She said she "wouldn't think he was of sound mind in the summer of 1944."

Mrs. Henry Miller who had known Mr. and Mrs. Meyer since before they were married and lived close to them in New London said they had visited back and forth for five or ten years when the Meyers first came to New London but after that the Meyers did not visit much with anybody. She said that in 1943 she bought pears from Mr. Meyer but instead of letting her pick them he kept picking up spoiled pears and putting them in the basket and she dumped them out and told him she wanted good ones. She said Mrs. Meyer came out while they were picking the pears and Mr. Meyer "grabbed her [Mrs. Meyer] by the arm and got her in the house and locked the door." She further stated: "Mrs. Meyer was taken to the asylum in November 1943, and Mr. Meyer lived there alone for about two years or better after that, and while there living alone he would apparently get lost and go into the neighbors' houses thinking it was his own." She said she would not think

he was of sound mind when he was going into wrong houses in 1943.

On January 31, 1943, Clara Totemeier and her sister, Jennie Brandemeyer, nieces of John Meyer, and contestants in this case, called at the John Meyer residence in New London. Clara Totemeier, who alone testified as to this visit, said Mr. Meyer was not dressed very good and she said Mr. Meyer asked who they were and Jennie Brandemeyer told him they were Mary's girls and he asked who Mary was and Mrs. Brandemeyer told him that Mary was his sister. Mrs. Totemeier said that previous to this visit she had seen Mr. Meyer in 1941 or 1942 in the stores in New London but she had never visited his home before. In fact, there is nothing in the record that Mr. Meyer ever had known Mrs. Totemeier, but Mrs. Brandemeyer testified she went to school with Mrs. Meyer and had been in their home many times, though the record does not show when she had visited the home prior to January 1943. Mrs. Totemeier testified she was of the opinion he was of unsound mind on January 31, 1943, based, presumably, on Mr. Meyer's failure to recognize his nieces.

Both of these nieces testified as to the filthy condition of the house when they again visited Mr. Meyer in the Spring of 1944. He was then living alone and it is enough to say they found him living in a deplorable state, with the house full of vermin, rodents, and bodily excretions. At this time they found a box on a shelf in a closet with $2645 in it. The Totemeiers bought John Meyer's car in 1944 and in cleaning out the front seat they found Mrs. Meyer's will crumpled up beneath the cushion. Mrs. Totemeier said she did not know how the will got there but she said it could have been that it got in the car during the time they moved his things to Clara Meyer's home.

On June 16, 1943, Mr. Meyer executed a voluntary application for the appointment of a guardian. This was presented to Judge McCoid who testified he refused to sign an order appointing a guardian, as was requested in the application. Upon objection by proponent he was not allowed to state the reason for his refusal to appoint a guardian.

Mr. Meyer reported $4000 moneys and credits to the assessor for 1941 and 1942 but none for 1943. The assessor testified that Mr. Meyer told him he had lost some money at home and that someone had taken it.

In 1942, Mr. Meyer asked a hardware merchant, who was his neighbor, to measure and repair a screen door. A short time later he returned to this neighbor's home and told him that he had obtained wire and fixed the door. Later the neighbor investigated and found the door had not been fixed.

On Thanksgiving day, 1943, the day after Mrs. Meyer had been taken to the institution, Meyer attended a family dinner at Mrs. Totemeier's home. During the meal Mr. Meyer was confused over the identity of his grandniece and grandnephew. His grandniece, Mrs. McCabe, testified he should have known them as he had their high school graduation pictures (she had graduated from high school in 1934) and she had occasionally been in his home—the record rather indicates the visits to the Meyer home were in 1944 or 1945.

On December 27, 1943, pursuant to petition, notice and hearing, an order was entered finding John Meyer incompetent and appointing Ed Smith, assistant cashier of the New London bank, the guardian of his person and property. The guardian testified that John Meyer told him about his personal property; that Mr. Meyer knew he held the note and mortgage, all of the bonds, all of the certificates of deposit, the bank accounts, the unpaid rent due him, the automobile, the membership certificates in a savings and loan association, and all other personal property listed in his inventory. His inventory was amended when the $2645 that was found in a box in the home was brought to him by Mr. Meyer in 1944 and also when $500 more cash was turned over to him which was found by workmen who were repairing the house in 1946. He also said a $1000 bond and some Iowa Soap Company shares were turned over to him which were found by a garage mechanic under the floor mat of the car—evidently before the guardian filed his inventory in February 1944. He said that after he was appointed guardian Mr. Meyer continued to live alone in the house and he turned over money to him and Mr. Meyer bought his own groceries and paid his other household expenses. He said Mr. Meyer

talked with him about the purchase of $1500 worth of war bonds in February 1944 and told him to see that Pleasant Grove Township got credit for the bonds that were purchased. Sometime later in 1944 he was moved to the home of his sister, Clara Meyer, and the guardian rented the house.

In November of 1946, the guardian signed an information with the Commissioners of Insanity of Henry County, charging that his ward was insane and on November 15, 1946, he was found insane and committed to the hospital for the insane at Mount Pleasant, where he died of pneumonia about five weeks later. Dr. Ristine, the hospital superintendent, testified that when he examined Mr. Meyer upon his entrance to the state hospital in 1946, there was a "complete dementia and loss of mind." He also described "senile dementia" and in reply to a hypothetical question stated that in his opinion Mr. Meyer was mentally incompetent on August 11, 1943, and did not have testamentary capacity on that date.

The foregoing is the evidence which contestants list in their brief as pointing toward senile dementia and which they argue is sufficient to raise a jury issue upon the question of testator's lack of testamentary capacity on August 11, 1943. The trial court, at the time he directed the verdict, stated that in his opinion the evidence was "not sufficient to present a jury question" and "a finding of testamentary incapacity on August 11. 1943, or the date the will was executed, would involve speculation and conjecture." We are convinced the trial court was right.

I. When the testamentary capacity of a testator is challenged, the burden is on the contestants to show that the testator did not have mind enough to know and comprehend, in a general way, the natural objects of his bounty, the nature and extent of his estate, and the distribution he wished to make of it. In re Estate of Fitzgerald, 219 Iowa 988, 259 N. W. 455; In re Estate of Sinift, 233 Iowa 800, 10 N. W. 2d 550, and cases there cited.

II. There is not the slightest evidence that the testator here did not know and comprehend the natural object of his bounty. The test refers to the time of his making of the will. With no children the natural object of his bounty was his wife.

While it may be the contestants, being of the next-of-kin class, would also be natural objects of his bounty (see In re Walther's Estate, 177 Or. 382, 163 P. 2d 285, but see In re Nolan's Estate, 25 Cal. App. 2d 738, 78 P. 2d 456, holding collateral heirs are not natural objects of testator's bounty) his selection of his wife as sole beneficiary was normal and natural. There is no showing that his older sister Clara was without means, and no showing that there was any close intimate relationship with the descendants of his two deceased sisters. The will shows he knew his wife was mentally incompetent. She had not, at the time he executed the will, been committed to an institution. The record is silent as to the state of her physical health. But he no doubt knew that she would have to be cared for all the days of her life. The direction then made to devote his entire estate to that care was clearly the act of one who comprehended the claim of the person who had the strongest claim on his bounty. Perhaps his mentality did not survive his wife's death. We need not speculate on his failure to change his will after his wife was committed to an institution or after her death, if he was then able to execute a will. We read the will in the setting of August 11, 1943, when this seventy-four-year-old testator was caring for his mentally sick wife in his New London home. John Meyer by his will gave his wife, who had first claim on his care and support while he was alive, all of his estate if he should die. Surely this was recognition and comprehension of the natural object of his bounty.

III. There is no evidence that John Meyer did not know the nature and extent of his estate. All who had property dealings with him, such as the bankers and the guardian, testified that he knew all about his realty and his money, bonds, mortgages and other items of personal property. His misplacing money and certificates is no proof that he did not know about his property. He knew they were lost and thought they might be stolen but his action in securing duplicate certificates was the normal action of one who knew about his property. That he made somewhat of a nuisance of himself because of losing property, and his failure to understand the procedure to obtain duplicates, is no proof of lack of comprehension of his estate.

Of those who had business dealings with him only one, Mr. Brenneman, expressed an opinion "that he needed a guardian." But this banker said he wanted a guardian for him as a business precaution and when the guardian was not appointed on the voluntary application in June of 1943 he dealt with Mr. Meyer and his attorney in the consolidation of the certificates in July and he continued to handle his checking account, even personally cashing Mr. Meyer's counter check in December of 1943. Moreover, Mr. Brenneman said: "The opinions expressed by me are based on general transactions and conduct and general appearance and a number of other things, based on a lot of things that probably have not been brought out or won't be brought out in the testimony." But even accepting the opinion of one banker that he needed a guardian, the evidence is surely no stronger than the application for a guardian that Mr. Meyer signed. We have held the signing of such an application by a testator two and a half months before executing a will, with other evidence of mental deterioration, childishness, forgetfulness, unclean personal habits, changed personality, and inability to transact business generally, is not sufficient to carry to the jury the question of a testator's unsoundness of mind. In re Estate of Johnson, 222 Iowa 787, 269 N. W. 792.

The other evidence of his failure to recognize relatives, going to the wrong house, forgetfulness, neglect of his person and clothing, offensive and disgusting personal habits when he was living alone, and other eccentricities does not show that he was of unsound mind when taken with the fact that the record is absolutely barren of any testimony to show that he did not know his financial condition, and all the testimony affirmatively shows that he managed his property, collected rents, deposited in his bank accounts until the guardianship in December of 1943 and paid his own bills after the guardianship while he lived alone in his home.

It is our conclusion that neither singly nor collectively did the various incidents proved by the contestants show that testator was incapacitated to make testamentary disposition of his property. Not one of them nor all of them together had any legitimate tendency to show that he was not fully aware

of what he was doing when he executed the will; that he did not have in mind his estate; and that he did not know the natural objects of his bounty.

Space will not permit a review of our prior opinions where we have held similar testimony as here introduced insufficient to generate a jury question on testamentary capacity. But see In re Estate of Johnson, 222 Iowa 787, 269 N. W. 792, previously cited, for a case where we held no jury question was presented by evidence of the execution of a prior voluntary guardianship application, evidence of complete dementia fourteen months after the execution of the will, evidence of a physician who had examined testator subsequent to the execution of the will in answer to a hypothetical question that the testator was of unsound mind on the date of the execution of the will, lay evidence of opinions, evidence tending to show a lessening of testator's physical and mental powers, evidence of eccentricities, forgetfulness, unclean personal habits and much more evidence similar to the evidence introduced here. See also In re Estate of Sinift, 233 Iowa 800, 10 N. W. 2d 550, and cases there cited.

The opinion of the lay witnesses that he was of unsound mind rises no higher than the facts on which they are based. Those who expressed an opinion that he was of unsound mind had had but slight contact with him during the time when the will was drawn. We have already said that forgetfulness, going to wrong houses, failing to recognize people he should know and uncleanliness are not sufficient to show unsoundness of mind sufficient to establish testamentary incapacity. The opinion of witnesses that he was mentally incompetent because of their observance of these lapses and traits adds nothing to such evidence.

With insufficient evidence from the lay witnesses of disqualifying senility on August 11, 1943, we are left with the evidence of the adjudications of incompetence in December 1943 and of insanity in November 1946 and the opinion of the expert, Dr. Ristine, based on the hypothetical question that embodied about all of the contestants' evidence. The adjudication of incompetence and the appointment of a guardian after the will was drawn would not alone justify an inference of mental incompetence when the will was drawn. Spiers v. Hendershott,

142 Iowa 446, 120 N. W. 1058; In re Estate of Howe, 172 Iowa 723, 154 N. W. 1001.

The same can be said with respect to the adjudication of insanity and the finding of advanced stages of senile dementia in November 1946, more than three years and three months after the will was drawn. Spiers v. Hendershott, 142 Iowa 446, 120 N. W. 1058; In re Estate of Johnson, 222 Iowa 787, 795, 269 N. W. 792, 796. In the last cited case we said:

"It is true that senile dementia is a progressive disease. Dr. Stewart testified that the decedent was in the advanced stages of senile dementia in November 1934. There is no evidence that he had this disease on October 26, 1933 [the date of the will], other than the inference that might be drawn from the fact that the disease is progressive. If the testator was afflicted with this disease on the date of the will, there is no evidence of the stage of the disease on that date.

"Where senile dementia is relied on to invalidate a will, there must be such failure of the mind as to deprive the testator of intelligent action. Gates v. Cole, 137 Iowa 613, 115 N. W. 236; In re Estate of Koll, 200 Iowa 1122, 206 N. W. 40. There is an entire lack of evidence that the testator had reached this stage on October 26, 1933."

The mere fact that the expert witness, Dr. Ristine, from the hypothesized facts, expressed his opinion that testator was of unsound mind and lacked testamentary capacity on August 11, 1943, did not warrant the submission of the case to the jury when the opinion was based on a recital of facts which the law does not recognize as showing testamentary incapacity. 32 C. J. S., Evidence, section 569h, page 403. Sayre v. Trustees of Princeton University, 192 Mo. 95, 90 S. W. 787; Stevens v. Meadows, 340 Mo. 252, 100 S. W. 2d 281; In re Phillips Estate, 299 Pa. 415, 149 A. 719.

From our review of the evidence we conclude it would not rationally support a verdict for the contestants assuming that a jury took, as it would be entitled to take, a view of the evidence most favorable to the contestants. The verdict for the pro-

ponent was rightly directed. The judgment based thereon is affirmed.—Affirmed.

HALE, C. J., and WENNERSTRUM, SMITH and MANTZ, JJ., concur.

GARFIELD, OLIVER, BLISS, and HAYS, JJ., dissent.

GARFIELD, J. (dissenting)—I respectfully dissent.

I. The last case of this kind decided by this court is Ipsen v. Ruess, 239 Iowa 1376, 35 N. W. 2d 82. We there held, all justices concurring, the evidence of mental incapacity warranted submission to the jury. Study and comparison of the record and briefs now before us and those in the cited case lead to the conclusion this case is fully as strong as the Ruess case. Only the issue of mental incapacity was really involved in the cited case—contestants made no complaint of the withdrawal of the issue of undue influence. The two cases are strikingly similar.

Here testator died at seventy-seven on December 10, 1946, in the hospital for the insane at Mount Pleasant after twenty-five days' confinement there with senile dementia. Testator Ruess died at seventy-two October 7, 1946, in the same institution after sixteen days' confinement there with the same disease. Here testator's will was made August 11, 1943. The Ruess will was executed May 15, 1942.

Possibly contestants in the Ruess case offered more evidence of mental incapacity than was produced by contestants here. But much of the evidence in the cited case was from contestants themselves. Here much of the testimony is from disinterested witnesses. And the evidence of mental incapacity in each case is essentially of the same character. Here of course proponents offered no testimony. In the cited case (to quote from the opinion at page 1383 of 239 Iowa, page 88 of 35 N. W. 2d):

"It is true there is an impressive array of witnesses for proponents who have drawn a quite different picture of testator. Some thirteen nonexpert witnesses, all apparently disinterested, most of them of long and rather intimate acquaintance (many of over thirty years) with testator, testified in effect they never

observed any of the unusual matters related by contestants and gave their opinion he was of sound mind down to the time of his last illness in 1946."

In the cited case the doctors who examined and treated testator said he was of sound mind as late as 1945 and 1946 and the expert testimony favorable to contestants came from a doctor who had never seen testator. Here Dr. Ristine examined Mr. Meyer on November 15, 1946, and observed him the last twenty-five days of his life.

In the Ruess case there was no adjudication of mental incapacity until September 21, 1946, over four years and four months after the will was made. Here a guardian was appointed for testator's person and property December 27, 1943, four months and sixteen days after execution of the will. The decree recites, "John D. Meyer is incompetent and is not able by reason of such incompetency to properly manage his person and property." The guardianship petition prepared by testator's attorney on December 2, 1943, three months and twenty-one days after the will was made, states, "Meyer is wholly unable to manage his property because of the condition of his health and mind * * *; * * * defendant's property may become dissipated unless proper precautions are taken in the very near future."

In view of the evidence testator suffered from senile dementia from a time antedating the will and the showing as to the nature of that disease, the guardianship proceedings are properly to be considered. In re Estate of Austin, 194 Iowa 1217, 1223, 191 N. W. 73, and citations; annotations 7 A. L. R. 568, 575, 68 A. L. R. 1309, 1312, 168 A. L. R. 969, 999.

While we have said in the Ruess case (page 1383 of 239 Iowa, page 88 of 35 N. W. 2d) and several earlier ones that "precedents are not controlling upon a question of this kind because the facts are usually not similar" the majority's decision here seems irreconcilable with our unanimous conclusion in the cited case. See also the recent decisions therein cited: In re Estate of Ring, 237 Iowa 953, 22 N. W. 2d 777; In re Estate of Maier, 236 Iowa 960, 20 N. W. 2d 425; In re Estate of Grange, 231 Iowa 964, 2 N. W. 2d 635.

II. This record is too long to permit a review of all of it herein. I shall attempt not to set out evidence to which the majority correctly refers. Of course the testimony will be construed in the light most favorable to contestants. See Gregory v. Proffit, 239 Iowa 463, 468, 31 N. W. 2d 899, 902; In re Estate of Maier, 236 Iowa 960, 968, 20 N. W. 2d 425, 429, and citations.

Testator's attorney filed an application for the appointment of a voluntary guardian for Mr. Meyer on June 16, 1943, nearly two months before the will was made. The application recites "due to his advanced age and the general state of his health he is not able to properly manage or supervise his affairs." Testator was only seventy-four at the time and his physical health seems not to have been impaired until a few days before he died. It is fairly to be inferred Mr. Meyer's mental condition made this application necessary.

This application was preceded by discussions over a period of some six months between the attorney and testator's hometown bankers, all of whom were doubtless acting in good faith for Mr. Meyer's welfare. One of the bankers testified he felt from his experience with testator he needed a guardian at least as early as June 1943, and the witness did not consider him competent to handle such a simple business matter as the renewal of a certificate of bank deposit.

The judge to whom the voluntary application was presented refused to appoint a guardian. The reason for this refusal does not appear. Contestants argue it was because the judge felt Mr. Meyer was mentally incompetent to apply for voluntary guardianship. Whether this be true or not, the jury could find a guardian was then needed because Mr. Meyer was mentally incapable of renewing certificates of deposit and keeping track of his money and other things of value.

Let us consider now testator's condition on November 15, 1946, when Dr. Ristine examined him: "He didn't know where he was. He could make no correct answers to questions. He had no conception whatever of the passage of time; no recognition of people; he was extremely agitated, restless, taking bed clothing off of other patients' beds; getting lost and was in a general complete loss of mind, a condition we call senile dementia."

Dr. Ristine expressed the opinion from assumed facts the evidence tends to establish and from his examination and observation of him that Mr. Meyer was mentally incompetent and without testamentary capacity (it appears the witness clearly understood the meaning of this term) on August 11, 1943, and "he had quite positive signs of the dementia, which developed to a greater degree later, *early in 1943 or possibly late 1942.*" Also, "Once established, senile dementia never gets better for the reason they suffer an actual loss of brain substance." Other testimony confirms Dr. Ristine's opinion.

For about two years before he was admitted to the hospital for the insane, of which Dr. Ristine was superintendent, testator stayed at the home of his sister, contestant Clara Meyer. For about the last year of this period Mr. Meyer's guardian made repeated efforts in different cities to find a hospital or home that would accept him but they all refused because he frequently ran away and required constant watching. This entry in the guardian's report, prepared by testator's attorney (one of proponent's attorneys here), is typical of the recitals therein: "April 1, 1946: (Also 3d, 5th, 12th, 23d, 24th) Was called on all the above dates to John D. Meyer home to take him home as he had wandered away. On April 24th he ran away from home five times and entered various homes. Ten hours and twenty-five miles with car."

In June 1945, at the home of his sister Clara, testator insisted on wearing a nephew's coat and hat because he believed they were his own and those present had "quite a time" getting them away from Mr. Meyer. Testator took a billfold from the nephew's coat, hid it in a dresser drawer, and within a few moments had forgotten what he had done. On this occasion Mr. Meyer insisted the nephew's car was his (Meyer's) and that the nephew pay his uncle for glass broken in the nephew's car.

In September or October 1944, in daylight, testator was lost and went to the home of a neighbor about two blocks from his own home in the small town of New London. He was looking for the home of his guardian in the opposite end of town. The neighbor escorted Mr. Meyer to his own home. "He didn't know where he was at until I got him to his own doorstep before he recognized his own home."

Early one morning in the summer of 1944 testator went to a dairy in New London and asked for a bottle of milk but said he did not have enough money to pay for it. He then took from his pocket "a whole handful of money" and the proprietor told him "You have enough money to buy all the milk we got." The proprietor gave him the milk, took a dollar from him and returned the change. Testator said he had walked in from the farm which was four or five miles from town. He was wet to his knees, apparently from wading in weeds or grass. It is to be inferred he was in a state of bewilderment.

In May 1944, Mr. Meyer was seen hiding in the bushes back of his house, he would get up and knock on the barn and then run back and hide in the bushes again. Similar performances were witnessed on two other occasions. Early one morning before testator went to live with his sister he imagined his wife, then confined in the asylum for the insane, was out in the rain during the night and asked his guardian so to notify the asylum.

In January 1944, testator urinated down the register in his home in the presence of lady callers. There is much evidence of filthy habits of this kind during this period. Numerous jars filled with urine were found in the pantry, bowel movements were on the floor, food was spoiled, there was no drinking water, the house was infested with mice. A year earlier, more than six months before the will was made, "His clothes were soiled pretty bad, the house was awful dusty and there was quite an odor in the house." Before 1942 testator was neat, clean and careful in his appearance.

In January 1944, testator imagined he had attended a sale north of Burlington and "bought a large bunch of horses." At this time he accused his guardian of "taking everything away from him" and threatened "if he monkeys around here I'll blow his brains out." At the guardian's request guns kept in Mr. Meyer's house were taken from him.

Testator ate Thanksgiving dinner in 1943 at the home of his niece Clara Totemeier in New London. His sister Clara Meyer and the Totemeier children were also there. Mr. Meyer was unable to help himself to the food and wanted to eat out of the main serving dish with a spoon. Although it was the

usual Thanksgiving dinner he did not seem to know what the food was. After dinner he wanted to go home but did not know what direction to go and had to be taken.

Mrs. Henry Miller testified:

"A. He would go up the street or come back and would stop and want to go to his house but would always make a mistake and go into Mr. Swan's house and I would tell him 'that isn't your home, Mr. Meyer,' but he seemed to think it was, so I kept telling him he lived next door but still he didn't think it was right; he would go around to the kitchen door and when he found out that door was locked he would go to the next place. *This occurred quite often in 1943.*"

In the Spring of 1943 testator inquired at the Ford garage whether repair work on his car had been finished when he had never asked to have the work done.

The banker Eckey said that in 1942 and the early part of 1943 testator came to the bank in reference to certificates of deposit he thought he had lost. "I imagine several times a week he would come in about the same thing. He seemed to forget what I had told him before and he would come back for the same thing over."

The banker Cullen testified he first knew Mr. Meyer about 1938 or 1939 and last saw him *in January 1943.* "He was certainly much more confused or seemed to be having lots more difficulty taking care of his affairs when I last knew him than he did when I first knew him."

As the majority observes, attorney Vance said that in 1942 Mr. Meyer was confused and unable to comprehend what was necessary in order to get money for his certificates of deposit or get them duplicated.

There is other testimony to which no reference is made either herein or by the majority. However, I think enough has been mentioned to demonstrate that when construed most favorably to contestants there is substantial evidence of mental incapacity at the time the will was executed. Of course no one knows the precise moment at which the progressive, permanent mental disease which afflicted testator reached the state where he was deprived of testamentary capacity. I think the jury

could properly find such state was reached, just as Dr. Ristine testified, prior to August 11, 1943. Had the making of the will been delayed a few weeks there is no doubt a jury question would have been presented.

What right has the majority to disregard the testimony of a reputable and apparently impartial alienist who examined testator, on the ground his opinion was based on a recital of facts "the law does not recognize as showing testamentary incapacity"? As Dr. Ristine testified, "We base our judgment of mental diseases on the abnormal things people feel, say and do * * *." Since when has the law not recognized such facts as are herein referred to as evidence of testamentary incapacity? And the doctor's opinion was based in part on his examination and observation of testator.

III. The majority asserts in its Division I the burden is on contestants to show testator did not have mind enough to know and comprehend, in a general way (1) the natural objects of his bounty (2) the nature and extent of his estate, *and* (3) the distribution he wished to make of it. While such statement appears in In re Estate of Fitzgerald, 219 Iowa 988, 996, 259 N. W. 455, In re Will of Johnson, 201 Iowa 687, 689, 207 N. W. 748, and perhaps some other decisions, it is unfortunate and misleading because it infers that in order to prevail, contestants must establish testator's incapacity in all these respects whereas proof of incapacity in any of them is sufficient. Further, the majority's statement overlooks the fact that testamentary capacity also involves ability to understand the nature of the instrument testator is executing. See In re Estate of Ring, 237 Iowa 953, 967, 22 N. W. 2d 777, 784, and citations; 57 Am. Jur., Wills, section 64; 1 Page on Wills, Lifetime Ed., section 132, page 268.

The true rule, repeatedly recognized by us, is in substance that one has testamentary capacity if he has sufficient mentality to (1) understand the nature of the instrument he is executing (2) know the nature and extent of his property (3) remember the objects of his bounty, and (4) know the distribution he desires to make. Lack of any of these requirements results in testamentary incapacity. See Perkins v. Perkins, 116 Iowa 253, 260, 90 N. W. 55; Bishop v. Scharf, 214 Iowa 644, 653, 241

N. W. 3, and citations; In re Estate of Ring, supra. See also 57 Am. Jur., Wills, section 64, and, especially, 1 Page on Wills, Lifetime Ed., section 132, pages 268, 269, where it is said:

"He must have sufficient mind and memory to understand all of these facts; and a charge, in negative form, that capacity is lacking if testator is not able to know all of these facts, is erroneous, since he lacks capacity if he is unable to understand any one of them."

IV. I do not agree there is not the slightest evidence testator did not know the natural objects of his bounty. Insofar as the will provides for the wife it is not unnatural or unreasonable. But she was incurably insane and advanced in years. A sane man would know that in addition to the income probably only a small part of testator's estate of over $50,000 would be needed to support the wife during her lifetime, and upon her death the property would pass to her brother or her more remote heirs. The will makes no disposition of the property upon the wife's death.

As might have been anticipated, the wife predeceased testator and under the antilapse statute (section 633.16, Code, 1946) the wife's brother acquired the entire estate *under this will*. In re Estate of Conner, 240 Iowa 479, 491, 492, 36 N. W. 2d 833, 840, 841, and citations. A next door neighbor testified she never knew this brother to visit the Meyers. However testator was often seen in the home of his older sister who housed and cared for him the last two years of his life when he was so hard to manage.

It is unnatural, unreasonable and unjust for this sizable estate to go under this will to the brother of the deceased wife to the exclusion of testator's own sister and the children of his two deceased sisters with whom he was on friendly terms and who at best were in modest circumstances. It is hard to believe Mr. Meyer understood the nature of the instrument he was executing. If he were sane he would be presumed to know of the antilapse statute and its effect on the bequest to his wife in the event she predeceased him. In re Estate of Finch, 239 Iowa 1069, 1084, 1085, 32 N. W. 2d 819, 826, 3 A. L. R. 2d 1403, and citations.

I think these contestants are more natural objects of testator's bounty than is his wife's brother. There is substantial evidence testator lacked mind enough to know this. On January 31, 1943, over six months before the will was made, testator was unable to recognize two nieces, one of whom, Clara Totemeier, had then lived in New London about five years, and the other went to school with testator's wife and had been in their home many times. When he was told they were Mary's daughters, it was necessary to explain to him that Mary was his sister. I do not agree there is nothing in the record to show Mr. Meyer ever had known Clara Totemeier.

At the Thanksgiving dinner in 1943 testator was unable to identify the Totemeier adult children and when told who they were could not remember them for even a few minutes. Totemeiers' married daughter had lived in New London all her life except four years, had been in Mr. Meyer's home occasionally and had often seen him in his sister's home. The testimony as a whole would warrant the finding testator was mentally incapable of remembering the natural objects of his bounty.

V. Nor do I agree there is no evidence Mr. Meyer did not know the nature and extent of his estate. I think there is substantial testimony he was incapable of such knowledge as early as 1942 and grew progressively worse thereafter. Of course anyone will at times lose or misplace belongings. But here, as early as 1942, there is evidence testator was unable to remember from day to day what property he had. He was constantly under the false impression certificates of deposit had been lost or stolen and when the facts were explained to him was incapable of remembering them.

In 1942 a certificate of deposit testator insisted was lost was found by Mr. Cullen in Mr. Meyer's safe-deposit box. In 1943, presumably in the spring, testator claimed to the assessor he had lost money in his home and he thought someone had taken it. He reported to the assessor he had no moneys and credits although he then had several thousand dollars which he had reported in previous years. In May 1944, two nieces discovered a pasteboard box containing $2645 on a closet shelf in Mr. Meyer's home. The guardian reported this "money had obviously been hidden" by testator. In February 1946, workmen

in the Meyer home discovered about $500 in a bookcase. In 1945 an auto mechanic found $3000 of securities under the seat of testator's car. About this time the will of testator's wife made in February 1934 was found, soiled and crumpled, in the back end of his car. It is a fair inference Mr. Meyer did not know he had any of the money or valuable papers found by others. This evidence together with other testimony as to testator's mental condition would warrant a finding he did not know the nature and extent of his estate.

Of course a mere scintilla of evidence is not enough to create a jury question in a 'will contest—or in any case. Substantial evidence of testamentary incapacity at the time of the will is necessary. And it is also sufficient. 57 Am. Jur., Wills, section 133. Where the record is such that reasonable minds may differ on the ultimate question in any case, including a will contest, the court should not direct a verdict. The jury are the triers of fact in a will contest as in other cases. See In re Estate of Ensminger, 230 Iowa 80, 81, 296 N. W. 814, 815, and citation.

Perhaps we have occasionally lost sight of these fundamental considerations. In the more recent decisions cited in Division I hereof we seem to have kept them in mind. From the majority opinion it appears we have again lost sight of them. I think this case should have been submitted to the jury and therefore I would reverse.

OLIVER, BLISS and HAYS, JJ., join in this dissent.